**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IRONHAWK TECHNOLOGIES, INC., a Delaware corporation, *Plaintiff-Appellant*, | No. 19-56347 |
| | D.C. No. 2:18-cv-01481-DDP-JEM |
| v. | |
| DROPBOX, INC., a Delaware corporation, *Defendant-Appellee.* | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted February 8, 2021
Pasadena, California

Filed April 20, 2021
Amended July 6, 2021

Before: A. WALLACE TASHIMA, MILAN D. SMITH, JR., and MARY H. MURGUIA, Circuit Judges.

Order;
Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge A. Wallace Tashima

# SUMMARY[*]

## Lanham Act

The panel filed (1) an order granting a petition for rehearing, amending the panel's opinion, and denying a petition for rehearing en banc; and (2) an amended opinion reversing the district court's grant of summary judgment in favor of defendant Dropbox, Inc., vacating the judgment, and remanding for trial in an action brought under the Lanham Act by Ironhawk Technologies, Inc.

Ironhawk developed computer software that uses compression and replication to transfer data efficiently in "bandwidth-challenged environments." It markets this software under the name "SmartSync," and it obtained a trademark registration for SmartSync in 2007. Dropbox's "Smart Sync," launched in 2017, is a feature of Dropbox's software suite that allows users to see and access files in their Dropbox cloud storage accounts from a desktop computer without taking up the computer's hard drive space. Ironhawk sued Dropbox for trademark infringement.

The panel held that there was a genuine dispute of material fact as to the likelihood of consumer confusion under a reverse confusion theory of infringement, which occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, thinks that the senior user is the same as or is affiliated with the junior

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

user. Specifically, a reasonable jury could conclude that consumers would believe Dropbox is a source of, or a sponsor of, Ironhawk's Smart Sync. The panel concluded that, based on competing evidence, a genuine dispute of fact remained as to the relevant consuming public. Applying the *Sleekcraft* factors, the panel concluded that a reasonable trier of fact could find a likelihood of confusion.

Dissenting, Judge Tashima wrote that he agreed with the general trademark principles articulated by the majority, but he was not persuaded that a reasonable jury could find a likelihood of consumer confusion. Judge Tashima agreed with the majority's conclusion that the relevant consumer class included not only Ironhawk's existing military customers, but also potential commercial customers to whom Ironhawk said it marketed its SmartSync software. Judge Tashima wrote that the majority erred, however, in failing to consider that these potential customers were large, sophisticated commercial enterprises, and any sale would be subject to a prolonged sales effort and careful customer decision making.

## COUNSEL

Keith J. Wesley (argued), Lori Sambol Brody, and Matthew L. Venezia, Brown George Ross LLP, Los Angeles, California; Alex Kozinski, Law Office of Alex Kozinski, Rancho Palos Verdes, California; for Plaintiff-Appellant.

Beth S. Brinkmann (argued), Covington & Burling LLP, Washington, D.C.; Clara J. Shin, Jeffrey M. Davidson, Matthew Q. Verdin, and Amy S. Heath, Covington & Burling LLP, San Francisco, California; for Defendant-Appellee.

**ORDER**

Defendant-Appellee Dropbox, Inc.'s petition for rehearing (Dkt. 65) is **GRANTED**. The Opinion filed on April 20, 2021 is amended by the Opinion filed concurrently with this Order.

The panel unanimously voted to deny the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED.** No further petitions for rehearing or rehearing en banc may be filed.

---

**OPINION**

M. SMITH, Circuit Judge:

Ironhawk Technologies, Inc. (Ironhawk) sued Dropbox, Inc. (Dropbox) for trademark infringement and unfair competition. The district court granted summary judgment, concluding that Ironhawk could not prevail because a reasonable trier of fact could not find a likelihood of consumer confusion. Ironhawk appeals based on a theory of reverse confusion. Because genuine issues of material fact remain as to a likelihood of reverse confusion, we reverse, vacate the judgment, and remand for trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

Ironhawk developed computer software that uses compression and replication to transfer data efficiently in

"bandwidth-challenged environments." Since 2004, Ironhawk has marketed this software under the name "SmartSync." Ironhawk obtained a trademark registration for SmartSync in 2007, which makes it the senior mark holder and user in this case.

Dropbox produces cloud storage software that millions of individuals and businesses use worldwide. "Smart Sync" is a feature of Dropbox's software suite that allows a user to see and access files in his or her Dropbox cloud account from a desktop computer without taking up the computer's hard drive space. Smart Sync is a feature of certain paid subscription plans, not a stand-alone Dropbox product. Dropbox launched Smart Sync in 2017, while it was aware of Ironhawk's senior SmartSync mark.

## II.

Ironhawk asserts claims against Dropbox for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. Ironhawk alleges that Dropbox's use of the name Smart Sync intentionally infringes upon Ironhawk's SmartSync trademark and is likely to cause confusion among consumers as to the affiliation of Ironhawk's product with Dropbox.

The district court granted summary judgment to Dropbox, concluding that "[t]he overwhelming balance of the *Sleekcraft* factors weighs against a likelihood of confusion" such that "a reasonable trier of fact could not conclude that Dropbox's use of Smart Sync is likely to cause consumer confusion." The district court entered judgment, and Ironhawk appeals.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction pursuant to 28 U.S.C. § 1291. "The decision to grant summary judgment in a trademark infringement claim is reviewed *de novo*, and all reasonable inferences are to be drawn in favor of the non-moving party." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). "Although disfavored in trademark infringement cases, summary judgment may be entered when no genuine issue of material fact exists." *Id.* "[O]n a defendant's motion for summary judgment, not only does the movant carry the burden of establishing that no genuine dispute of material fact exists, but the court also views the evidence in the light most favorable to the non-moving party." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016). To prevail at summary judgment, "[t]he defendant-movant must demonstrate that, even viewing the evidence in the light most favorable to the plaintiff, the plaintiff cannot satisfy its burden to prove its claims." *Id.*

**ANALYSIS**

**I.**

"A successful trademark infringement claim under the Lanham Act requires a showing that the claimant holds a protectable mark, and that the alleged infringer's imitating mark is similar enough to 'cause confusion, or to cause mistake, or to deceive.'" *Surfvivor*, 406 F.3d at 630 (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004)).

This appeal primarily focuses on the issue of consumer confusion. "We have recognized two distinct claims in the trademark infringement context: forward confusion and

reverse confusion. Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Id.* (citations omitted). "By contrast, reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id.* On appeal, Ironhawk relies exclusively on a reverse confusion theory of infringement.

We have explained that reverse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998). This can occur when "the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user[.]" 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020) (citations and footnotes omitted); *see Dreamwerks*, 142 F.3d at 1130 n.5.

Affiliation with a popular well-known brand may seem beneficial, but reverse confusion carries consequences. Reverse confusion can foreclose the senior user from expanding into related fields and could place the senior company's goodwill in the hands of the junior user. *Dreamwerks*, 142 F.3d at 1129. As the Sixth Circuit explained, the result of reverse confusion "is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987); *see also Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins.*

*Agency, Inc*., 214 F.3d 432, 445 (3d Cir. 2000) ("[T]he doctrine of reverse confusion is designed to prevent the calamitous situation [where] a larger, more powerful company usurp[s] the business identity of a smaller senior user.").

When assessing reverse confusion on summary judgment, we ask whether a genuine dispute of material fact exists as to the likelihood of confusion. Specifically, whether a reasonable jury could conclude that consumers would believe Dropbox is the source of, or a sponsor of, Ironhawk's Smart Sync. *See Surfvivor*, 406 F.3d at 630. To answer this question, we consider the following "*Sleekcraft* factors":

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1080 (9th Cir. 2005) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)). These factors are neither exhaustive nor dispositive; "it is 'the totality of facts in a given case that is dispositive.'" *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002)).

## II.

Before addressing the *Sleekcraft* factors, we must define the relevant consumer market because "a court conducting a trademark analysis should focus its attention on the relevant consuming public." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012).

Dropbox argues that the relevant consuming public is limited to the United States Navy because that is Ironhawk's only active customer. To support this contention, Dropbox submits evidence showing that Ironhawk generated significant revenue between 2009 and 2019, with only one non-military client, a national pharmacy chain, which paid Ironhawk $32,000 in 2013. In addition, Dropbox contends that the United States Navy, and therefore the relevant consumer, could never be confused as to the source or affiliation of SmartSync because the Navy exercises significant care when purchasing products through its military procurement process.

Ironhawk responds that the relevant consumer class includes potential business partners and customers in the broader commercial, non-military marketplace. According to Ironhawk, we cannot limit the analysis to customers that previously purchased SmartSync—targeted and potential customers are relevant too. In so arguing, Ironhawk submits evidence that it had one commercial customer (a national pharmacy chain), that it actively markets SmartSync to other potential commercial customers, and that it actively pursues partnership opportunities with other commercial businesses. For example, Ironhawk proposed implementing SmartSync into products offered by two leading cloud storage companies that are two of Dropbox's biggest competitors. Ironhawk contends these discussions were unsuccessful and any future negotiations are foreclosed because neither

Dropbox Smart Sync competitor would risk the customer confusion resulting from announcing their products were "powered by SmartSync." Ironhawk also submits evidence that Dropbox itself explored acquiring Ironhawk before it launched its Smart Sync feature, which suggests to Ironhawk that the two companies target similar or related customers.

Based on this competing evidence, a genuine dispute of material fact remains as to the relevant consuming public. "[I]t is well established that confusion on the part of potential consumers may be relevant." *Id.* at 1215. And while Ironhawk's attempts to acquire commercial customers have been largely unsuccessful, we must view the evidence in the light most favorable to Ironhawk and draw all reasonable inferences in its favor on summary judgment. *JL Beverage Co.*, 828 F.3d at 1104–05; *Dreamwerks*, 142 F.3d at 1130 n.3. Ironhawk had one commercial customer in the past and submitted evidence of its recent attempts to acquire more. Therefore, a reasonable jury could find that Ironhawk's potential consumers include commercial customers.

### III.

We now turn to the *Sleekcraft* factors, each of which presents a highly factual inquiry. While we have described this inquiry as exhausting, the list of factors is "neither exhaustive nor exclusive." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) (citation omitted). Instead, "the factors are intended to guide the court in assessing the basic question of likelihood of confusion." *Id.* (citing *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)). "The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *Id.* The factors should be considered together to determine, under the totality of the circumstances, whether a likelihood of confusion exists. *See*

*Pom Wonderful*, 775 F.3d at 1125 (quoting *Entrepreneur Media*, 279 F.3d at 1140). Where conflicting facts render it unclear whether a likelihood of confusion exists, summary judgment is inappropriate. *See JL Beverage Co.*, 828 F.3d at 1106.

## A.

We first address the strength of the two marks. Because the question in reverse confusion cases is "whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user" we evaluate the conceptual strength of Ironhawk's mark and compare it to the commercial strength of Dropbox's mark. *See id.* at 1107 (quoting *Dreamwerks*, 142 F.3d at 1130).

With respect to the conceptual strength of SmartSync, "[t]rademark law offers greater protection to marks that are 'strong,' i.e., distinctive." *E. & J. Gallo Winery*, 967 F.2d at 1291. Marks are "classified into one of five categories of increasing distinctiveness" that warrant increasing protection: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010). "Generic marks are not eligible for trademark protection." *Id.* Descriptive marks are not inherently distinctive and are not entitled to trademark protection unless they have acquired secondary meaning. *Id.* Where, as here, the Patent and Trademark Office issued a registration without requiring proof of secondary meaning, the federal registration provides *prima facie* evidence that the SmartSync mark is inherently distinctive (*i.e.*, at least suggestive). *Id.* at 1111–14. Dropbox, however, may rebut this presumption.

While Dropbox does not challenge the validity of the mark, it contends that SmartSync is descriptive, which it

contends would lessen or eliminate any confusion. The district court agreed, concluding that SmartSync is descriptive because it "appears to describe at least some of the characteristics of Ironhawk's product, namely synchronization and 'intelligent' transport, compression, and synchronization."

On summary judgment, however, the question is whether a reasonable jury could find that Ironhawk's SmartSync mark is at least suggestive. Importantly, the line between descriptive and suggestive marks is elusive, and "[w]hich category a mark belongs in is a question of fact." *Zobmondo*, 602 F.3d at 1113. "Descriptive marks define a particular characteristic of the product in a way that does not require any imagination[.]" *JL Beverage*, 828 F.3d at 1107. Suggestive marks, by contrast, "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *Id.* As we explained in *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir. 2009), "legions of trademark lawyers can stay busy arguing about how marks in the middle, not so plainly descriptive, nor so plainly distinctive, should be categorized."

While we agree with the district court that Ironhawk's mark could be considered descriptive, given the presumption of distinctiveness established by SmartSync's federal registration, and the elusive nature of the inquiry, a reasonable jury could conclude the mark is suggestive. The jury, therefore, should determine whether SmartSync is descriptive or suggestive.[1]

---

[1] Notably, Ironhawk submitted evidence under seal that Dropbox may consider SmartSync to be more than descriptive.

Whether descriptive or suggestive, the important question in a reverse confusion case is "whether the junior mark is so [commercially] strong as to overtake the senior mark." *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000). Accordingly, we assess the commercial strength of Dropbox's Smart Sync mark and ask whether it is able to swamp the reputation of Ironhawk's SmartSync with a much larger advertising campaign. *See Dreamwerks*, 142 F.3d at 1130 n.5.

The district court concluded that the commercial strength of Dropbox's mark was of "little import" because "Ironhawk's SmartSync mark is conceptually weak." In so concluding, the district court explained that "where a mark is conceptually weak, it is less likely that consumers will associate it with any source, even a commercially strong junior user." The district court erred for two reasons.

First, whether Dropbox rebutted the presumption of distinctiveness established by SmartSync's federal registration is for the jury to decide. Second, given the evidence Ironhawk presented of Smart Sync's commercial strength, it is for the jury to decide "whether [Dropbox's] junior mark is so [commercially] strong as to overtake [Ironhawk's] senior mark." *Walter*, 210 F.3d at 1111 n.2. As we noted in *Cohn*, "in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) (per curiam) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000)).

Ironhawk offers the following evidence of Smart Sync's commercial strength: (1) Dropbox spends $7,000 per month

on Google keyword advertising related to "Smart Sync"; (2) Dropbox made significant marketing expenditures that prominently promoted the launch of Smart Sync alongside other features of Dropbox's software suite; (3) Dropbox made significant online advertising expenditures for Smart Sync in 2018; (4) Google searches for "smartsync" or "smart sync" yield results that prominently feature Dropbox's software; and (5) Dropbox is a widely recognized brand with millions of users. Given the extensive efforts to associate Smart Sync with Dropbox, Ironhawk contends that if Dropbox's Smart Sync makes a major misstep and stains its reputation with the public, Ironhawk's SmartSync could suffer with it. *See Dreamwerks*, 142 F.3d at 1130.

Based on the evidence presented, a reasonable jury could find that Dropbox's Smart Sync is commercially strong, and when considered against the conceptual strength of Ironhawk's SmartSync mark, is able to swamp Ironhawk's reputation with a much larger advertising campaign. *See id.* at 1130 n.5.

**B.**

We next turn to the relatedness of the goods and services. Goods and services are related when they are complementary, sold to the same class of purchasers, or similar in use and function. *Sleekcraft*, 599 F.2d at 350. Ironhawk "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor." *Rearden*, 683 F.3d at 1212. Instead, "[r]elated goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Id.* (quoting *Sleekcraft*, 599 F.2d at 348 n.10).

The district court concluded that the products were unrelated, holding that "[i]t is undisputed that the United States Navy is the only user of Ironhawk's product . . . [and] [t]he mere fact that both products deal in some manner with the transfer of electronic data is not enough to render the products similar for purposes of a trademark analysis."

Ironhawk disagrees and argues that the products are similar because they perform the same function: they "facilitate file sharing amongst teams." Ironhawk also suggests that "both products provide a solution to the same problem: how to make files accessible to multiple remote users." Ironhawk further argues that both products occupy the same data management field and involve transferring large files. Finally, Ironhawk notes that Dropbox explored acquiring Ironhawk before launching Smart Sync, which to Ironhawk suggests the two companies offer complementary products.

Dropbox responds that the products are unrelated. Dropbox focuses on the principal purpose of Smart Sync— to provide cloud storage and free up disk space—and the principal purpose of SmartSync—to compress, transfer, and replicate large files in limited bandwidth environments. In Dropbox's view, Smart Sync addresses limited disk space while SmartSync addresses limited bandwidth. Dropbox also contends that SmartSync does not offer cloud storage, which is a central feature of Smart Sync. Dropbox further emphasizes that Smart Sync is used by individuals and businesses, while SmartSync's only active user is the United States military.

Based on this competing evidence, a reasonable jury could find that Smart Sync and SmartSync are related, sold to the same class of purchasers, or similar in use and function.

## C.

We next assess the similarity of the marks. To do so, we rely on three general principles. "First, '[s]imilarity is best adjudged by appearance, sound, and meaning.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (quoting *Entrepreneur Media*, 279 F.3d at 1144). "Second, the 'marks must be considered in their entirety and as they appear in the marketplace.'" *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000)). "Third, 'similarities are weighed more heavily than differences.'" *Id.* (citation omitted). "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc.*, 202 F.3d at 1206.

The district court acknowledged that SmartSync and Smart Sync are virtually identical in sight, sound, and meaning, but, relying on *Cohn*, 281 F.3d 837, concluded that this factor weighed against the likelihood of confusion because "each party consistently includes its business name or house mark alongside its version of the disputed mark."

While the district court correctly concluded that a company's consistent use of a house mark can reduce the likelihood of confusion, in a reverse confusion case the junior user's use of a house mark can also aggravate confusion by reinforcing the association between the mark and the junior user. *See Sleekcraft*, 599 F.2d at 351; *A & H Sportswear*, 237 F.3d at 230.

We addressed how a house mark can aggravate confusion in *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284 (9th Cir. 1992). In that case, a manufacturer sold stuffed teddy bears using its "Wedding Bears" trademark. *Id.* at 1286. A competitor later started selling a

line of teddy bears that included a permanent tag with "Wedding Bear" on one side and its house mark on the other. *Id.* We found that the competitor's use of its house mark did not negate the similarity of the marks because use of the house mark "may serve to create reverse confusion that [the competitor], and not [plaintiff], is the source of [plaintiff]'s 'Wedding Bears.'" *Id*. at 1288.

Not only can using a house mark aggravate reverse confusion, the district court also erred by relying on *Cohn*. In *Cohn*, the senior user was a veterinary clinic, Critter Clinic, that used the tagline "Where Pets Are Family" in its advertising. *Cohn*, 281 F.3d at 839. The junior user was the local Petsmart pet store, which offered in-store veterinary services and displayed the same "Where Pets Are Family" tagline in its advertising. *Id.* We concluded that the marks were dissimilar when viewed in context because the parties always used their house marks (Critter Clinic and Petsmart) alongside the taglines and because the house marks, rather than the taglines, were the dominant aspects of the overall marks. *Id.* at 842.

*Cohn*'s reasoning does not apply here because SmartSync is not a tagline or slogan, it is the product name, which Ironhawk contends is also its dominant commercial identity. For example, Ironhawk presents deposition testimony from an IBM employee who explained some people in the military are familiar with SmartSync but not with Ironhawk. In addition, Ironhawk's CEO declared that, "oftentimes when I go into a customer's briefing room, only SmartSync will be up on the board," not Ironhawk. Ironhawk also presents evidence that the parties do not always use their house marks alongside the Smart Sync and SmartSync marks, which contradicts the district court's finding. And, when Dropbox does use its house mark, that can aggravate

reverse confusion. *A & H Sportswear*, 237 F.3d at 230; *Americana Trading*, 966 F.2d at 1288.

Based on this evidence, a reasonable jury could find that the marks are similar and that Dropbox's use of its house mark aggravates the likelihood of reverse confusion.

**D.**

We next address whether Ironhawk presented evidence of actual confusion between Smart Sync and SmartSync. "Evidence of actual confusion by consumers is strong evidence of likelihood of confusion." *Surfvivor*, 406 F.3d at 633. "Because of the difficulty in garnering such evidence," however, "the failure to prove instances of actual confusion is not dispositive." *Sleekcraft*, 599 F.2d at 353 (citing *Drexel Enters., Inc. v. Hermitage Cabinet Shop, Inc.*, 266 F. Supp. 532, 537 (N.D. Ga. 1967)). Therefore, "this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *Id.*

Ironhawk relies on testimony from two witnesses as evidence of actual confusion. The first, Ironhawk's CEO, declares that "unknown third parties from the Navy at trade shows have expressed concern about 'double purchasing' SmartSync", and "at a recent trade show, during discussions with . . . a big data analytics company, [he] was asked whether Ironhawk was affiliated with Dropbox." He further states that, "in a 2018 meeting with [a leading cloud storage company], Ironhawk was asked about the relationship between its SmartSync[] and Dropbox['s Smart Sync]."

Ironhawk's other witness, an IBM employee who sells Ironhawk products, testified in his deposition that consumers to whom he pitched SmartSync believed they already owned

it, when they actually owned similarly named products from Dropbox or Salesforce.

Dropbox responds that Ironhawk's CEO's declaration is insufficient to show actual confusion because it does not "identify any specific individuals who were confused; rather he made uncorroborated statements that various unnamed third parties or individuals had mixed up, or were concerned that others would mix up, Ironhawk and Dropbox." The district court agreed by not crediting Ironhawk's evidence and finding no evidence of actual confusion.

However, while a "district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence," Ironhawk's CEO's declaration is not devoid of specific facts. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015). The lack of certain specific details goes to the weight of the testimony, not its admissibility. *See id.* at 499. And "the weight is to be assessed by the trier of fact at trial, not to be the basis to disregard the evidence at the summary judgment stage." *Id.*

Dropbox also challenges additional evidence submitted by the IBM employee because it "consists of fabricated emails, ghostwritten by Ironhawk's CEO." In response to this allegation, Ironhawk submits deposition testimony from the IBM employee who testified that his email, although drafted by Ironhawk's CEO, reflects his own views. What weight to afford that testimony and the accompanying emails is also a question for a jury.

Ultimately, Ironhawk offered evidence of actual confusion among actual or potential customers. While we have some doubt that the jury will find this factor to be in Ironhawk's favor, it is evidence a reasonable jury could rely

on to support a finding of actual confusion or when assessing a likelihood of confusion under the totality of the circumstances.

## E.

We next address whether the parties' marketing channels overlap. "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130.

The district court concluded that the parties use different marketing channels because "Dropbox markets via the internet to customers who self-register on Dropbox's website, while Ironhawk attends military trade shows and obtains contracts through military bidding processes."

Ironhawk disagrees, arguing that the parties use similar marketing channels because both products are advertised on the General Services Administration (GSA) website, and both companies employ salespeople to sell their products.

Dropbox counters that no substantial overlap exists because Dropbox's marketing activities are conducted primarily on the internet, while Ironhawk focuses on military trade shows. Dropbox also challenges Ironhawk's evidence, arguing that Dropbox does not advertise on the GSA website, and even if other vendors or manufacturers offer Dropbox products on that site, none of the Dropbox products offered mention Smart Sync in the online product listing.[2] Dropbox also presents evidence that, unlike Ironhawk,

---

[2] Ironhawk notes that while Smart Sync is not specifically listed on the GSA website, each of the Dropbox plans listed include Smart Sync as a feature.

Dropbox's marketing does not specifically target the military.

The evidence presented suggests very little overlap between the parties' marketing channels. Notably, both companies employing salespeople is of little significance without evidence those salespeople target the same class of customers. *Cf. Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) ("[I]t would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."). While this factor seems to weigh against a finding of a likelihood of confusion, the trier of fact should determine what weight to afford it when considering the totality of the circumstances.

**F.**

Under the sixth *Sleekcraft* factor, we assess the sophistication of the customers and ask "whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor*, 406 F.3d at 634. "When the buyer has expertise in the field," or "the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Sleekcraft*, 599 F.2d at 353; *see Walter*, 210 F.3d at 1112.

The district court concluded that this factor favors Dropbox and explained:

> It is undisputed that the only user of Ironhawk's product is the United States Navy, and that it takes years for the Navy to approve Ironhawk's proposals, and only then after numerous meetings with technical

crews. It is also undisputed that some of
Ironhawk's SmartSync licenses cost
thousands and tens of thousands of dollars.
Although the cost of Dropbox services is
much more modest, the high degree of care
exercised by the Navy, particularly for such
expensive products as Ironhawk SmartSync
licenses, weighs heavily against likelihood of
confusion.

Ironhawk acknowledges that the Unites States Navy is a
sophisticated consumer but argues that the likelihood of
confusion remains high because it also markets SmartSync
to commercial customers, even if those efforts have been
largely unsuccessful. Dropbox responds that this factor
looks at a party's "typical buyer," *Sleekcraft*, 599 F.2d
at 353, and here, the only typical buyer Ironhawk has is the
United States Navy.

As we concluded above, a reasonable jury could find that
Ironhawk's relevant customer base extends beyond the
United States Navy. However, the dissent argues that we end
our analysis prematurely and err "by failing to consider the
*type* of commercial customers Ironhawk is targeting and the
kind of sales it is proposing." In this regard, the dissent
contends that Ironhawk only targets "large, sophisticated
buyers" and "the sophistication of potential commercial
customers, the expense of the product, and the manner in
which Ironhawk markets its product—wholly eliminate any
realistic possibility of consumer confusion in this case."

But as we noted above, Ironhawk offered evidence of
actual confusion among these same sophisticated potential
commercial customers. *See* discussion *supra* Section III.D.
Viewing this evidence in the light most favorable to

Ironhawk, together with the genuine disputes presented on the remaining factors, demonstrates that a rational trier of fact could find that confusion is probable. *See JL Beverage*, 828 F.3d at 1105; *M2 Software, Inc.*, 421 F.3d at 1085 (quoting *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)). Therefore, Dropbox's sophisticated buyer argument fails at the summary judgment stage, and the trier of fact should consider this factor on remand.

## G.

We next assess Dropbox's intent to infringe. This factor "favors the plaintiff 'where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.'" *JL Beverage*, 828 F.3d at 1111–12 (quoting *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999)). In the reverse confusion context, we "ask whether there is some evidence that the junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the senior user." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020). Intent can be shown through evidence that the junior user deliberately intended to push the senior out of the market by flooding the market with advertising to create reverse confusion, or "by evidence that, for example, the [junior] knew of the mark, should have known of the mark, intended to copy the [senior], failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir. 2017) (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005)).

While Dropbox argues it was not aware of Ironhawk when it chose the name Smart Sync in 2015, there is no dispute that Dropbox knew of Ironhawk's SmartSync mark

before it launched Smart Sync to the public.[3] Therefore, based on the evidence presented, a reasonable jury could find that Dropbox "culpably disregarded the risk of reverse confusion." *See id.*; *see also Dreamwerks*, 142 F.3d at 1132 (remanding for trial where "[c]ounsel for DreamWorks conducted a diligent search and discovered the Dreamwerks mark, yet failed to make accommodations or select a different mark.").

## H.

The final *Sleekcraft* factor assesses the likelihood of expansion of product lines. In the context of non-competing goods, "a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354.

The district court concluded that Ironhawk did not present "evidence of a 'strong possibility' of expansion into the consumer market" due to Ironhawk's failure to obtain non-military clients and the limited detail about its recent discussions with potential commercial clients.

Disagreeing with the district court's determination, Ironhawk argues this factor favors a likelihood of confusion because Ironhawk is engaged in ongoing efforts to expand into the commercial, non-military market. Ironhawk acknowledges its limited success, but argues its efforts to acquire additional commercial clients are sufficiently concrete to establish a strong possibility of future expansion. Ironhawk relies on *Wendt v. Host International, Inc.*,

---

[3] The specifics facts surrounding this knowledge are part of the record filed under seal.

125 F.3d 806 (9th Cir. 1997), where we held that a television actor made the requisite showing by presenting "evidence that he would like to appear in advertisements for beer and ha[d] declined offers from small breweries in order to be available to a large brewery." *Id.* at 814. Ironhawk argues that its plans and future prospects are at least as concrete and plausible as those of the actor in *Wendt*.

Dropbox responds that Ironhawk's efforts to attract commercial customers are too speculative to show a "strong possibility" of expansion. Dropbox relies on *Surfvivor*, 406 F.3d at 634, where we held that an "expressed interest in expanding [a] product line" is insufficient to show a strong possibility of expansion.

While Ironhawk frames its arguments as expansion, Ironhawk already markets to commercial customers and a reasonable jury could include those potential customers in the relevant consumer base. Ironhawk also argues it intends to expand into the cloud storage business, but the evidence presented does not appear to meaningfully support that contention. Therefore, this factor is neutral and the trier of fact should determine what significance to afford it when considering the totality of the circumstances on remand.

## CONCLUSION

Each of the *Sleekcraft* factors presents a highly factual inquiry that considers competing evidence. So too does balancing these factors to determine, under the totality of the circumstances, whether a likelihood of confusion exists. Based on this highly factual inquiry, we conclude that genuine issues of material fact remain.

In so holding, we do not conclude that the trier of fact will find the *Sleekcraft* factors in Ironhawk's favor, or that a

likelihood of confusion exists under the totality of the circumstances. That is not our inquiry on summary judgment. Instead, we view the evidence in the light most favorable to Ironhawk, draw all reasonable inferences in Ironhawk's favor, and ask whether Dropbox carried its burden to establish that no genuine disputes of material fact exist as to the likelihood of confusion between Smart Sync and SmartSync. We conclude that Dropbox has not met that high burden. Accordingly, because a reasonable trier of fact could find a likelihood of confusion, we reverse the grant of summary judgment, vacate the judgment, and remand for trial.[4]

**REVERSED, VACATED, AND REMANDED.**

TASHIMA, Circuit Judge, dissenting:

While I agree with the general trademark principles articulated by the majority, which should guide our decision of this case, I part ways with the majority when it comes to the application of those principles to the record facts of this case. I am not persuaded that a reasonable jury could find a likelihood of consumer confusion. I, therefore, respectfully dissent.

This is a reverse confusion trademark infringement case. In such a case, we apply the familiar eight-factor *Sleekcraft* matrix. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). But, as our case law cautions, the *Sleekcraft*

---

[4] Because Ironhawk's claim under California's Unfair Competition Law is derivative of Ironhawk's Lanham Act trademark infringement claim, we reverse and remand that claim as well.

factors "must be applied in a flexible fashion," not as "a rote checklist," because "[a] determination may rest on only those factors that are most pertinent to the particular case before the court." *Rearden LLC v. Rearden Com. Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). The majority, unfortunately, has taken the rote-checklist approach.

To begin, I agree with the majority that we must first ask *whose* confusion matters. "[A] court conducting a trademark analysis should focus its attention on the relevant consuming public." Maj. Op. at 9 (quoting *Rearden*, 683 F.3d at 1214). I also agree with the majority that the relevant consuming public here includes not only the United States military— Ironhawk's only customer—but also potential customers in the commercial marketplace. It is true that, to date, Ironhawk has had very little success appealing to commercial customers. Since 2009, Ironhawk has had only a single non-military customer—a national pharmacy chain that paid Ironhawk $32,000 in 2013. Ironhawk, however, has presented evidence that its product has non-military applications, that it markets to potential commercial customers, and that it has had some—albeit quite limited— success in attracting those customers in the past. Viewing this evidence in the light most favorable to Ironhawk, as we must on summary judgment, a reasonable jury could find that Ironhawk's relevant consumer class is not limited to the United States military. As the majority points out, "it is well established that confusion on the part of potential consumers may be relevant." Maj. Op. at 10 (quoting *Rearden*, 683 F.3d at 1215).

There is, however, no evidence that the relevant consumer class includes ordinary consumers. In a declaration, Ironhawk CEO David Gomes tells us that Ironhawk has pursued commercial opportunities with two

leading cloud storage companies, a national pharmacy chain, a leading energy technology company, and a leading data analytics company. These are all large, sophisticated buyers.[1]

Ironhawk's product catalog confirms that it is marketing "enterprise software" and targeting sophisticated enterprises. The catalog, for instance, offers for sale annual licenses to SmartSync servers. These licenses sell for between $5,854 and $20,000 per server, and the catalog describes the product in the following, highly technical language:

> SmartSync DCS Server provides bandwidth-efficient data distribution over HTTP and HTTPS to and from remote SmartSync® Client, Peer, and Server nodes. Standard Edition features include the concurrent sending and/or receiving of data from remote nodes, has drop folders for easy and automatic shipping of files to remote destinations, and a web browser based user-interface. Professional Edition features have all Standard Edition features with the addition of priority-based bandwidth allocation for data transfers, bandwidth scheduling, and the plugin compatibility with SmartSync® SmartVideo™ Video Compression. Enterprise Edition has all Professional Edition Features with the addition of custom enterprise data workflows

---

[1] Because the record is sealed, I do not reveal the identities of these companies. It cannot be disputed, however, that they are all sophisticated enterprises.

> integration, FIPS 140-2 compliant transport, UDP multicast, and the plugin compatibility of custom processing of customer specific data. Cost is for annual license per CPU. See full feature matrix for additional features.

Only an expert in the information technology field could understand this product description. And such buyers would be expected to exercise great care before purchasing annual licenses costing as much as $20,000 per server.

The evidence further shows that Ironhawk's marketing efforts involve lengthy discussions and negotiations between Ironhawk and its potential customers. Ironhawk CEO David Gomes states further in his declaration that Ironhawk has "discussed" SmartSync with its potential commercial customers and emphasizes the "countless face-to-face meetings" he has had with its customers. There is no "add to cart" or "buy now" button on Ironhawk's website.

All of these factors—the sophistication of potential commercial customers, the expense of the product, and the manner in which Ironhawk markets its product—wholly eliminate any realistic possibility of consumer confusion in this case.[2]

- First, "[w]here the relevant buyer class is composed only of professionals or commercial

---

[2] I focus here on point of sale confusion rather than initial interest confusion because, although Ironhawk briefly mentions initial interest confusion on the penultimate page of its reply brief, it did not raise the issue in its opening brief. The issue of initial interest confusion is therefore waived. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) (noting that we ordinarily do not consider arguments raised for the first time in reply).

buyers familiar with the field, they are usually knowledgeable enough to be less likely to be confused by trademarks that are similar." 4 McCarthy on Trademarks and Unfair Competition § 23:101 (5th ed. 2021).

- Second, "[i]f the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration." *Id.* § 23:96. "[T]he average purchaser of an automobile," for example, "will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979), *superseded by rule on other grounds as stated in Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992).

- Third, confusion is less likely when the prospective sales in question "are not impulse purchases, but rather are subject to long sales efforts and careful customer decision making," *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 285 (3d Cir. 2001), or follow "extensive negotiations and discussions," *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 381 (7th Cir. 1996).

Given the presence of all of these factors, this is plainly a case in which Ironhawk's potential commercial customers "would take the time to distinguish between" Ironhawk's SmartSync and the cloud storage products offered by Dropbox, obviating any plausible risk of confusion. *See*

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).

"To determine whether there is a likelihood of confusion between the parties' allegedly related goods and services," we ordinarily consider the eight-factor *Sleekcraft* test:

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (citing *Sleekcraft*, 599 F.2d at 348–49). But, to repeat, these factors "must be applied in a flexible fashion," not as "a rote checklist." *Rearden*, 683 F.3d at 1209. And, if we follow *Rearden*'s admonition, we discover that, here, that determination rests on a single *Sleekcraft* factor: The type of goods and the degree of care likely to be exercised by the purchaser. In this case, this factor is highly probative, and none of the other factors, even when viewed in the light most favorable to Ironhawk, supports a finding of consumer confusion. Significantly, Ironhawk "must show sufficient evidence to permit a rational trier of fact to find that *confusion is 'probable,' not merely 'possible.'*" *M2 Software, Inc.*, 421 F.3d at 1085 (emphasis added) (quoting *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)). Ironhawk has not made this showing.

The Majority insists that Ironhawk has adduced "evidence of actual confusion among [its] sophisticated

potential commercial customers."  Maj. Op. at 22.  But the evidence of actual confusion that the Majority relies on, citing Part III.D of its opinion, relates only to initial interest confusion.  And, as I have pointed out, *see* footnote 2, *supra*, Ironhawk has waived that argument.  Ironhawk did not raise its initial interest confusion argument until the penultimate page of its Reply Brief.  Dropbox has had no opportunity to address or counter it, and the district court did not address it.  The Majority offers no reason why, contrary to our clearly established law, the key issue in this case should rest on an argument that Ironhawk did not timely raise, Dropbox had no opportunity to respond to, and the district court did not address.

·  ●  ·

As I stated at the beginning of this dissent, I agree with the majority's focus on the need to define the relevant consumer class and its conclusion that such a class includes not only Ironhawk's existing military customers, but also potential commercial customers to whom Ironhawk says it markets its SmartSync software.  The majority errs, however, by ending its analysis there, and by failing to consider the *type* of commercial customers Ironhawk is targeting and the kind of sales it is proposing.  These customers are large, sophisticated commercial enterprises.  They are purchasing a highly technical and expensive product.  And any sale would be subject to a prolonged sales effort and careful customer decision making.

These circumstances, disclosed by the record and uncontroverted, simply do not support a finding of probable consumer confusion, given the sophistication of the customer class.  Because I would affirm the judgment of the district court on this basis, I respectfully dissent.