**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LODESTAR ANSTALT, a Liechtenstein company,
*Plaintiff/Counter-Defendant/ Appellant*,

v.

BACARDI & COMPANY LIMITED, a Liechtenstein company; BACARDI U.S.A., INC., a Delaware corporation; BACARDI LIMITED, a Bermuda company,
*Defendants/Counter-Claimants/ Appellees.*

No. 19-55864

D.C. No.
2:16-cv-06411-CAS-FFM

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted July 10, 2020
Pasadena, California

Filed April 21, 2022

Before:  Bobby R. Baldock,[*] Marsha S. Berzon, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

---

## SUMMARY[**]

### Trademark

The panel affirmed the district court's summary judgment in favor of Bacardi U.S.A., Inc., and two of its affiliates in a trademark infringement action brought by Lodestar Anstalt.

The Madrid Protocol, as implemented by amendments contained in Title XII of the Lanham Act, provides that applicants with trademark protection in other countries may obtain an "extension of protection" in the United States, generally equivalent to a trademark registration, without first having used the mark in commerce in the United States. Instead, an extension of protection may be granted under Title XII based on the applicant's declaration of a bona fide intent to use its foreign-registered mark in the United States.

In 2011, Lodestar obtained an extension of protection for its Liechtenstein-registered trademark in the use of the word "Untamed" in connection with whiskey, rum, and other

---

[*] The Honorable Bobby R. Baldock, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

distilled spirits.    After Bacardi began an advertising campaign in November 2013 using the phrase "Bacardi Untameable" to promote its rum products, Lodestar filed suit for trademark infringement and unfair competition.

The panel concluded that, even assuming that Lodestar's first use of its mark in United States commerce occurred after Bacardi's campaign began, under the distinctive regime established for the Madrid Protocol, Lodestar's subsequent bona fide use of its registered mark on certain rum products gave rise to a priority of right that it could seek to enforce under the Lanham Act.    Finding useful precedent and commentary addressing a similar issue under the comparable provision of § 44 of the Lanham Act, which addresses registration of foreign marks under the provisions of any applicable "convention or treaty relating to trademarks," the panel concluded that, under the Madrid Protocol, as under § 44, a foreign applicant who obtains a registration without showing actual use in the United States has a right of priority, as of the relevant "constructive use" date, over another company who first uses the mark in the United States.    And once that registrant begins actually using the mark in the United States (and does so even after the competing user has begun using the mark) the registrant may bring an infringement action (subject to any applicable defense) based on that superior right of priority.

Nonetheless, Lodestar failed to satisfy the basic elements of an action for trademark infringement because it failed to show that Bacardi's campaign involved a likelihood of confusion with Lodestar's bona fide use of its registered mark in commerce.    Lodestar claimed "reverse confusion," in which a person who knows only of a well-known junior user comes into contact with a lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that

the senior user is the same as or is affiliated with the junior user.

The panel concluded that, in deciding which of Lodestar's products should be considered, the district court erred in applying a categorical temporal rule excluding any consideration of a senior user's post-infringement use of the mark on additional products. Nonetheless, the panel agreed that Lodestar's Untamed Revolutionary Rum product should be excluded from the likelihood-of-confusion analysis because it did not reflect a bona fide use of the mark. A reasonable jury, however, could find that Lodestar's use of the Untamed Work Mark on the back of its bottles of The Wild Geese Soldiers & Heroes rums constituted bona fide use in commerce.

Applying the *Sleekcraft* factors, the panel concluded that Lodestar failed to carry its burden to show a likelihood of confusion. The panel concluded that the district court erred in certain respects in its consideration of the strength of the mark and Bacardi's intent, but those errors did not alter the ultimate conclusion that no reasonable jury could find a likelihood of confusion.

---

**COUNSEL**

G. Warren Bleeker (argued), Gary J. Nelson, and Drew Wilson, Lewis Roca Rothgerber Christie LLP, Glendale, California, for Plaintiff/Counter-Defendant/Appellant.

Michael C. Lynch Jr. (argued) and Andrea L. Calvaruso, Kelley Drye & Warren LLP, New York, New York, for Defendants/Counter-Claimants/Appellees.

**OPINION**

COLLINS, Circuit Judge:

This trademark dispute requires us to consider the scope and priority of rights granted by an "extension of protection" for a trademark under the "Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks," June 27, 1989, T.I.A.S. No. 03-1102, commonly known as the "Madrid Protocol." A key feature of the Madrid Protocol, as implemented by amendments contained in Title XII of the Lanham Act, is that applicants with trademark protection in other countries may obtain an "extension of protection" in the U.S.—which is generally equivalent to a trademark registration—*without* first having used the mark in commerce in the United States. Instead, an extension of protection may be granted under Title XII based on the applicant's declaration of a bona fide intent to use its foreign-registered mark in the U.S.

In this case, Lodestar Anstalt ("Lodestar") obtained in 2011 an extension of protection for its Liechtenstein-registered trademark in the use of the word "Untamed" in connection with whiskey, rum, and other distilled spirits. After Bacardi U.S.A., Inc. began an advertising campaign in November 2013 using the phrase "Bacardi Untameable" to promote its rum products, Lodestar brought this trademark-infringement suit against Bacardi U.S.A., Inc. and two of its affiliates (collectively, "Bacardi"). The district court entered summary judgment against Lodestar. On appeal in this court, the parties vigorously dispute whether Lodestar used its "Untamed" mark in commerce in the U.S. before Bacardi's campaign, but we find it unnecessary to decide that issue. Even assuming that Lodestar's first use of its mark in U.S. commerce occurred after Bacardi's campaign began, we conclude that, under the distinctive regime

established for the Madrid Protocol, Lodestar's subsequent bona fide use of its registered mark on certain rum products gave rise to a priority of right that it could seek to enforce in an action under the Lanham Act.  But Lodestar is still required to satisfy the basic elements of an action for trademark infringement, including a showing that Bacardi's campaign involved a likelihood of confusion with Lodestar's bona fide use of its registered mark in commerce.  Because Lodestar failed to make that showing, we affirm the district court's grant of summary judgment.

# I

Before turning to the facts of the parties' dispute, we begin with a brief overview of how registration of trademarks under the Madrid Protocol differs from the ordinary process of trademark registration under the Lanham Act.

## A

The basic principle underlying federal and state trademark law is "that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others" and that the "[o]ne who *first* uses a distinct mark in commerce" thereby "acquires rights to that mark."  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) (emphasis added); *see also Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce."); *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) ("[A] fundamental tenet of trademark law is that ownership" of a trademark "is governed by priority of use.").  Although "federal law does not create trademarks," *B&B Hardware*, 575 U.S. at 142, it does "provide a degree of

national uniformity," *Matal v. Tam*, 137 S. Ct. 1744, 1751–52 (2017). In particular, to "help[] to ensure that trademarks are fully protected and [to] support[] the free flow of commerce," the federal Lanham Act establishes a system of national trademark registration, managed by the U.S. Patent and Trademark Office ("PTO"), to assist in establishing priority of trademark rights. *Id.* at 1752. "Registration does not create a mark or confer ownership," however, because "only use in the marketplace can establish a mark." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006). Accordingly, the general rule remains that "[a]ll common law and registration rights" rest on the use-based rule of "first-in-time, first-in-right." 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:1 (5th ed. 2022 Update) (hereinafter "MCCARTHY ON TRADEMARKS").

Because registration does not itself create trademarks, it is not mandatory and the "owner of an unregistered mark may still use [the mark] in commerce and enforce it against infringers." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019). But trademark registration under the Lanham Act "confers 'important legal rights and benefits' on trademark owners who register their marks." *B&B Hardware*, 575 U.S. at 142 (citation omitted). "[R]egistration constitutes 'prima facie evidence' of the mark's validity," *Iancu*, 139 S. Ct. at 2297 (quoting 15 U.S.C. § 1115(a)); it provides "'constructive notice of the registrant's claim of ownership,' which forecloses some defenses in infringement actions," *id.* at 2297–98 (quoting 15 U.S.C. § 1072); it "can make a mark 'incontestable' once a mark has been registered for five years," *Matal*, 137 S. Ct. at 1753 (quoting 15 U.S.C. § 1065, 1115(b)) (further citations and internal quotation marks omitted); and it "enables the trademark holder 'to stop the importation into the United States of articles bearing an infringing mark,'" *id.* (citation omitted). Obtaining

registration thus provides "significant" legal rights that assist in protecting one's trademarks.  *B&B Hardware*, 575 U.S. at 142.

Under the Lanham Act, the ability to secure registration for a trademark typically depends, as trademark rights generally do, upon actual use of the mark in commerce. Thus, § 1 of the Act has long made registration available to the "owner of a trademark *used in commerce*," and it requires an application by any such owner to attest that "the mark *is in use in commerce*."  15 U.S.C. § 1051(a)(1), (3) (emphasis added); *see also* 15 U.S.C. § 1051(a)(1) (1946) (similar).  But in 1988, Congress amended § 1 to also allow an application for registration to be filed based on the applicant's "bona fide *intention* . . . to use a trademark in commerce."  15 U.S.C. § 1051(b)(1) (emphasis added). Such an intent-to-use application, however, cannot be *granted* unless and until the applicant subsequently files a "verified statement that the mark is in use in commerce."  *Id*. § 1051(d)(1).  If that statement is filed within a specified timeframe,[1] then, when registration is granted, the initial date of the intent-to-use application becomes the applicant's "constructive-use date," which "gives the applicant priority-of-use over anyone who adopts the mark after [that] date." *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1111 n.3 (9th Cir. 2010).  Specifically, § 7(c) of the Act states that, "[c]ontingent on the registration of a mark," the "*filing* of the application to register"—which, in the case of an intent-to-use application, will not initially be accompanied by actual use—"shall constitute *constructive* use of the mark," thereby conferring a general "right of

---

[1] The verified statement must be filed within six months, absent extension, of the issuance by the PTO of a "notice of allowance" of the intent-to-use application.  15 U.S.C. §§ 1051(d)(1)–(2), 1063(b)(2).

priority, nationwide in effect," as of the date of the application.  15 U.S.C. § 1057(c) (emphasis added).

By giving priority of right based on constructive use rather than actual use, the intent-to-use registration mechanism reflects, to that limited extent, a departure from trademark law's traditional emphasis on priority of actual use.  As the D.C. Circuit has explained, one purpose of the 1988 amendments allowing priority based on such constructive use was to avoid a situation in which a company undertakes potentially costly preparations to develop and use a mark, only to lose priority to others, including trademark "pirates," who outpace the company in making actual commercial use of the mark.  *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 19 (D.C. Cir. 2008) (citation omitted).

The Madrid Protocol, as implemented in the 2002 amendments to the Lanham Act, reflects an additional departure from the traditional emphasis on assigning priority of rights based on actual use.  The Protocol establishes an international trademark registration system, and the United States' participation in that system became operative upon the effective date of a new Title XII of the Lanham Act, which added §§ 60–74 to the statute.  *See* 15 U.S.C. §§ 1141–1141n; *see also* Pub. L. No. 107-273, § 13403, 116 Stat. 1758, 1920 (2002), 15 U.S.C. § 1141 note (noting that Title XII took effect on Nov. 2, 2003).  The Protocol allows holders of trademark rights in their respective countries to "secure protection" for their marks in other contracting parties by obtaining, through their home country's trademark office, an "international registration" in the "register of the International Bureau of the World Intellectual Property Organization."  *See* Protocol Relating to the Madrid Agreement Concerning the International

Registration of Marks, art. 2, June 27, 1989, T.I.A.S. No. 03-1102.

For foreign trademark owners who seek to extend protection, under the Protocol, *into* the United States, Title XII of the Lanham Act provides that any "request for extension of protection of an international registration to the United States that the International Bureau transmits" to the PTO "shall be examined as an application for registration on the Principal Register" under the Lanham Act.  15 U.S.C. §§ 1141f(a), 1141h(a).  If "it appears that the applicant is entitled to extension of protection," then the PTO "shall cause the mark to be published" in its Official Gazette.  *Id*. § 1141h(a).  If there is no successful opposition and no grounds for refusal of the request, then the PTO "shall issue a certificate of extension of protection," which "shall have the same effect and validity as a registration on the Principal Register."  *Id*. § 1141i(a), (b)(1).

Notably, § 68(a)(3) of the Lanham Act specifically states that "[e]xtension of protection shall *not* be refused on the ground that the mark has not been used in commerce." 15 U.S.C. § 1141h(a)(3) (emphasis added).  Rather, the PTO may properly file, and subsequently grant, a request for extension of protection so long as the request received from the International Bureau shows that, when that Bureau received it, the request had "attached to it a declaration of bona fide intention to use the mark in commerce."  *Id*. § 1141f(a).  The term "commerce," as used in the Lanham Act, including this section, "means all commerce which may lawfully be regulated by Congress."  *Id*. § 1127.  Thus, while a request for an extension of protection under the Madrid Protocol is similar to an intent-to-use application in that both may be *filed* based on a declaration of a bona fide intent to use the mark in U.S. commerce, a request under the Protocol

differs from an intent-to-use application in that it may also be *granted* without first showing actual use in commerce. However, under § 71(a) of the Act, a Madrid Protocol registrant's failure to file a statement of use in commerce "[w]ithin the 1-year period immediately preceding the expiration of 6 years following the date of issuance of the certificate of extension of protection" will result in the cancellation of the extension of protection.   15 U.S.C. § 1141k(a)(1), (b)(1)(A).  And a Madrid Protocol registrant remains subject to the general rule that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127.  What protection flows from a grant of registration under the Madrid Protocol is one of the disputed issues in this case and is addressed further below.

## B

Against this backdrop, we turn to the specific facts of this case.

## 1

Lodestar is a Liechtenstein company founded in June 2000 by Andre Levy, who remains its chairman.  Lodestar describes itself as a "small, independent developer of beverages," whose business model is to "independently create and develop innovative and unique brands of premium products in areas of growth which can be monetized by selling or licensing to a larger entity."  In 2000–2001, Levy and his wife began developing a brand of Irish whiskey called "The Wild Geese."  Levy explained that the brand was intended to evoke the story of the "Wild Geese, the name given to the Irish Diaspora who were forced to leave Ireland in 1691."   However, when Lodestar sought to secure protection of the "Wild Geese" mark in the U.S. in 2003, its

application drew objection from the holder of existing marks for "Wild Turkey" liquor products.  After Lodestar lost that dispute, the brand name in the U.S. was changed to "The Wild Geese Soldiers & Heroes" or "The Wild Geese Irish Soldiers & Heroes."  According to Levy, the dispute over the "Wild Geese" mark played out in "34 different countries around the world," and Lodestar lost only in the U.S.  As an outgrowth of that trademark dispute, in around 2008–2009, Lodestar developed the idea for the "Untamed" mark, which Levy said reflected Lodestar's decision not to give its trademark opponent the "impression" that Lodestar was "in any way, shape, or form tamed by the fact that [it] had lost the one action that they had won."

On August 19, 2009, the PTO accepted for filing two applications on behalf of Lodestar seeking extension of protection under the Madrid Protocol for internationally registered marks using the word "Untamed."  The two marks, which the parties respectively refer to as the "Untamed Design Mark" and the "Untamed Word Mark," were depicted as follows in Lodestar's applications:



The PTO published the marks for opposition in July 2011 and granted the requested extensions of protection on October 4, 2011.  Because Lodestar's applications rested on the Madrid Protocol, it was able to obtain these extensions

of protection without having to demonstrate that it was using the marks in commerce. *See* 15 U.S.C. §§ 1141f(a), 1141h(a)(3); *see supra* at 10–11.

Lodestar licensed the relevant trademarks for use by another Levy-controlled entity, which is currently organized under Panamanian law and is known as Avalon International Management, Inc. ("Avalon"). Avalon was assisted in promoting its products by Protégé International ("Protégé"), a Cyprus-based sales agency established by Levy. In April 2009, before Lodestar's applications concerning the Untamed marks were filed under the Madrid Protocol, Avalon imported 1,529 cases of various varieties of The Wild Geese Irish Soldiers & Heroes whiskey into the U.S., listing itself as the buyer, "c/o MHW Ltd." (its distributor). In early 2010, while those applications were pending with the PTO, Avalon imported into the U.S. another 1,848 such cases of whiskey, together with an additional 312 cases of smaller bottles of whiskey. As with the prior delivery, Avalon listed itself as the buyer, c/o MHW Ltd. Levy averred that these more than 3,600 cases of whiskey "have been continuously for sale in the U.S. ever since," but the record does not disclose exactly how many bottles have been sold to U.S. end consumers. An internal Protégé report in July 2013 indicated that sales were "very small and disappointing." An internal Protégé email to Levy in August 2013 reported that more than 2,200 cases of the larger bottles, which had been produced in 2008–2009, remained in stock and that Protégé had "stopped all active sales efforts for the whiskey."

The packaging of Avalon's bottles of The Wild Geese Irish Soldiers & Heroes whiskey used the Untamed Design

Mark, as illustrated by these examples in the district court record:



Lodestar's Untamed Word Mark was also used in advertising The Wild Geese Irish Soldiers & Heroes whiskey as early as 2011.  For example, the word "Untamed" was used as a standalone mark in two YouTube advertisements for The Wild Geese Irish Soldiers & Heroes whiskey that were published in 2011.[2]  Screenshots of these advertisements are depicted here:



---

[2] Lodestar presented evidence below that the Untamed Word Mark was also used "internationally" in connection with the promotion of "The Wild Geese" products.  Lodestar asserts that the target audience for such advertisements in international trade publications included U.S. persons,

**2**

By early 2013, Avalon began developing rum products under The Wild Geese Soldiers & Heroes brand, naming them "Premium Rum" and "Golden Rum."  Avalon's distributor, MHW Ltd., submitted proposed bottle labels for these products to the U.S. Department of the Treasury's Alcohol and Tobacco Tax and Trade Bureau ("TTB"), in accordance with regulations requiring TTB issuance of a "certificate of label approval" prior to removing imported distilled spirits "from Customs custody for consumption." *See* 27 C.F.R. § 5.51(a) (2013); *see also* 27 U.S.C. § 205(e). TTB issued the respective certificates for the Premium Rum and Golden Rum labels in February and March 2013.

The labeling for these new rum products distinctively used Lodestar's Untamed Word Mark.  Specifically, on the Premium Rum's back label, the word "Untamed" appears in larger text below 26 lines of brand-related smaller text.  The Golden Rum's back label displays the word "Untamed"

---

even though the U.S. brand was known as "The Wild Geese Irish Soldiers & Heroes."  *See supra* at 11–12.

beneath 18 lines of brand-related text and above a picture of a ship at sea.  The labels are shown in the record as follows:

   

Between June 2013 and December 2013, Avalon's distributor, MHW Ltd., sent four "sample" bottles each of the Golden Rum and Premium Rum to certain "potential customers" in the United States.  Two of each were sent in June, one of each in August, and the remainder in December. In addition, in April 2013, Protégé promoted The Wild Geese Soldiers & Heroes rum products at a booth at the 2013 Rum Renaissance Trade Show in Miami, Florida.  Various advertisements displayed in the booth used the word "Untamed" together with "The Wild Geese" brand name that was used outside the U.S.  At the trade show, Protégé displayed bottles that contained the Untamed Word Mark on the back label, and individual consumers were in attendance and sampled the rum.  A print advertisement featuring the Untamed Word Mark was also published in connection with the trade show.  Levy stated that the "purpose of going to the Miami Rum Renaissance" was "to expose the products to the consumer," meaning both wholesalers and end consumers.

Lodestar's booth at the Miami trade show, as well as the associated print advertisement, are depicted here:

 

After the show, Levy received a detailed report about potential distributors and a possible timeline for beginning sales in the U.S., possibly as early as August 2013.  But by June 2013, a Protégé employee sent an email to Levy informing him that they had "completed our strategic review and for now decided to park the USA rum project as we are getting better returns in other markets."

**3**

Meanwhile, at some point in 2012, Bacardi began developing what ultimately became a new advertising campaign for its rum products that would use, in various forms, the phrase "Bacardi Untameable."  An employee at a London-based marketing firm stated that she came up with the concept after being struck by the comment, on Bacardi's Wikipedia page, that the company had "'tamed' rum to be a clear liquid during the distilling process."

Prior to the launch of the campaign, Bacardi & Co. Ltd., the Liechtenstein-based Bacardi affiliate that holds the ultimate rights in Bacardi trademarks, ran a trademark clearance search in January 2013, and that search disclosed Lodestar's "Untamed" trademarks.  In July 2013, Bacardi &

Co. Ltd. sought extension of protection in the U.S., under the Madrid Protocol, for its Liechtenstein-registered trademark in the phrase "Bacardi Untameable." After the PTO published this request for extension of protection in December 2013, Lodestar filed an opposition before the Trademark Trial and Appeal Board ("TTAB") in April 2014, and Bacardi & Co. Ltd. filed counterclaims seeking cancellation of the Untamed Word and Untamed Design Marks. Further proceedings before the TTAB have been suspended pending the resolution of this suit.

Bacardi proceeded with the launch of the "Untameable" advertising campaign in November 2013. Bacardi never used the term "Untameable" on the labels of any of its products, but only in various forms of advertisements in a variety of media, including television, print publications, outdoor billboards and signs, and digital formats. In these advertisements, the phrase "Bacardi Untameable" was typically coupled with Bacardi's longstanding "bat" logo and the words "Since 1862." The following example in the record is illustrative:



Bacardi has not used the "Untameable" mark in any capacity since 2017.

**4**

Shortly after the start of Bacardi's "Untameable" campaign, Protégé announced on its website that "Untamed Revolutionary Rum" would be "coming soon." Lodestar conceded below that no such product existed at the time the Bacardi campaign was launched in November 2013, and Levy admitted in a February 2014 email that Untamed Revolutionary Rum was conceived "to complement the Wild Geese Rum and also to combat Bacardi's attempts to take over our Untamed mark."

Unlike The Wild Geese Soldiers & Heroes rum products, the new "Untamed Revolutionary Rum" included Lodestar's Untamed Word Mark in the name of the product. MHW submitted labels to TTB for approval in January 2014, and a certificate approving the following labels was issued in March 2014:





These labels for the first time featured the "Untamed" mark on the front label, and they did so much more prominently than with the earlier rum products.

In April 2014, Protégé first imported 2,000 cases of Untamed Revolutionary Rum into the U.S., listing "MHW/Avalon" as the buyer. In July 2014, Levy sent an email to a Protégé employee telling him that he "need[ed] to move this in the US in particular because of Bacardi and get it into distribution." Apart from three sample bottles distributed in August 2014, MHW did not begin distributing Untamed Revolutionary Rum to a wholesaler until late December 2014. The first sales to U.S. retailers occurred in January 2015.

During the same period, Protégé revived its previously suspended plans to distribute The Wild Geese Soldiers &

Heroes rums in the U.S., importing the first cases of such rums into the U.S. in April 2014. Avalon or Protégé was listed as the seller, and "MHW/Avalon" as the buyer, on import paperwork for 555 cases of The Wild Geese Soldiers & Heroes Golden Rum in April 2014 and for 419 cases of the Premium Rum in August 2014. MHW began selling these products to a wholesaler in late December 2014, at the same time it first began distributing Untamed Revolutionary Rum. The products, in turn, were sold to retailers beginning in January 2015.

## C

In August 2016, Lodestar brought this suit against Bacardi & Co. Ltd. (the holder of Bacardi's trademarks), Bacardi U.S.A., Inc. (the U.S. subsidiary that distributes and sells Bacardi products in the U.S.), and Bacardi Ltd. (the other two defendants' ultimate parent company) (collectively, "Bacardi"). The complaint asserts two federal causes of action—a claim for trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, and a claim for unfair competition under § 43 of the Act, *id*. § 1125. The complaint also asserts pendent state law claims for common law unfair competition and for violation of California's Unfair Competition Law ("UCL"), CAL. CIVIL CODE § 17200 *et seq*. Although the complaint initially asserted these claims based on both the Untamed Design Mark and the Untamed Word Mark, Lodestar subsequently abandoned any claims based on the former. Bacardi counterclaimed, seeking cancellation of both trademarks.

Bacardi moved for summary judgment in May 2019. It argued, as an initial matter, that Lodestar had abandoned its Untamed Word Mark by failing to make any bona fide use of it prior to Bacardi's campaign. Specifically, Bacardi argued that Lodestar had not offered for sale—as opposed to

advertising or offering sample bottles—any products branded with the Untamed Word Mark prior to Bacardi's campaign.   Bacardi also argued that no likelihood of confusion existed as a matter of law, and that Lodestar's Lanham Act claims therefore failed.   In making this argument, Bacardi relied in part on an expert report that compared "Bacardi Untameable" only with the Untamed Word Mark as it appears on The Wild Geese Soldiers & Heroes products—*not* on Untamed Revolutionary Rum. Bacardi also argued that Lodestar was not entitled to any monetary relief even if it could establish liability.

Lodestar filed a motion for partial summary judgment, arguing that the undisputed evidence established a likelihood of confusion between the parties' respective trademarks. Lodestar relied in part on an expert report that asserted a likelihood of confusion based on a comparison of "Bacardi Untameable" with the Untamed Work Mark as it was used on Untamed Revolutionary Rum.  Lodestar also argued that its use of the Untamed Word Mark on the back label of its rum products and in advertisements precluded a finding of abandonment as a matter of law.

In ruling on the motions, the district court first held that neither party was entitled to summary judgment on the issue of abandonment.   The court concluded that the evidence presented at summary judgment was both "sufficient to create a triable issue as to whether Lodestar intended to abandon the UNTAMED word mark" and "insufficient to establish that Lodestar had not abandoned the UNTAMED word mark as a matter of law."

Turning to the key issue of likelihood of confusion, the district court granted summary judgment in favor of Bacardi. On the threshold issue of whether Untamed Revolutionary Rum should be considered in the likelihood-of-confusion

analysis, the court held that the relevant products included only those that existed prior to the launch of Bacardi's campaign. Because it was undisputed that Untamed Revolutionary Rum "did not exist" before Bacardi's campaign, the district court concluded that it was not "a fair representation of Lodestar's products and how the UNTAMED word mark was used at the time of Bacardi's alleged infringement." After evaluating the relevant factors enumerated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), the district court held that "there is no evidence in the record that a reasonably prudent consumer in the marketplace would have mistakenly affiliated The Wild Geese Soldiers & Heroes rum with Bacardi."

The district court alternatively granted partial summary judgment in favor of Bacardi with respect to Lodestar's claims that it was entitled to a reasonable royalty and corrective advertising damages as a result of the alleged trademark infringement.

As to the state law claims, the court granted summary judgment on the common law unfair competition claim on the ground that there was no evidence in the record that "Bacardi passed off its rum products as another or that it acted fraudulently or with an intent to mislead consumers." And to the extent that any aspect of the UCL claim could survive the dismissal of all other claims, the court further held that Lodestar lacked any entitlement to monetary relief as a matter of law.

Having dismissed all of Lodestar's claims, the district court dismissed Bacardi's counterclaims without prejudice for lack of subject matter jurisdiction and entered judgment. Lodestar timely filed this appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

We review de novo the district court's grant of summary judgment to Bacardi on Lodestar's claims for trademark infringement under § 32 of the Lanham Act and for unfair competition under § 43 of the Act. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

Where, as here, a plaintiff's § 43 unfair competition claim is based on alleged infringement of a registered mark, the legal analysis under the two sections is essentially identical. *See Brookfield*, 174 F.3d at 1046 n.8. Accordingly, we address, in turn, the two elements of trademark infringement, which are (1) a "protectible ownership interest in the mark"; and (2) a likelihood of "consumer confusion" in the defendant's use of its allegedly infringing mark. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (citations omitted); *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014).[3]

---

[3] Lodestar also asserted below a related California common law claim for unfair competition as well as a claim that, by allegedly infringing Lodestar's trademark, Bacardi had violated California's UCL. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (noting that UCL and common law unfair competition claims based on trademark infringement are "'substantially congruent' to claims made under the Lanham Act") (citation omitted). However, the district court granted summary judgment to Bacardi on the common law claim, as well as on the monetary portion of the UCL claim, based on additional claim-specific grounds that Lodestar has not challenged on appeal. *See supra* at 23. Accordingly, Lodestar has forfeited any challenge to those rulings. *See Collins v. City of San Diego*, 841 F.2d 337, 339 (9th Cir. 1988). We address the non-monetary portion of Lodestar's UCL claim below. *See infra* at 57.

## III

As noted earlier, a foundational principle of trademark law is that ownership of, and priority of rights in, a mark are ordinarily determined by "priority of use." *Brookfield*, 174 F.3d at 1047. Here, the parties vigorously dispute both (1) who used the relevant marks first in U.S. commerce; and (2) whether the Madrid Protocol alters the traditional rule that priority of use determines priority of rights in trademarks.

As our earlier factual summary makes clear, the only evidence of Lodestar's[4] use of the Untamed Word Mark (as distinct from the Untamed Design Mark) in the U.S. prior to the launch of the Bacardi Untameable campaign in November 2013 consists of (1) a handful of ads for The Wild Geese Irish Soldiers & Heroes whiskey on YouTube in 2011, as well as advertisements for The Wild Geese whiskey in international trade publications that may have been read by U.S. industry insiders; (2) preparatory activities for the development of The Wild Geese Soldiers & Heroes rums, including presenting samples and advertising at a Miami trade show; and (3) delivery of six sample bottles of that rum. *See supra* at 13–17. Bacardi contends that, under our decisions in *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151 (9th Cir. 2001), and *Social Techs. LLC v. Apple Inc.*, 4 F.4th 811 (9th Cir. 2021), these activities are too minimal to constitute the sort of "use in commerce" that is needed to establish trademark rights, and it argues that *Bacardi* is

---

[4] For purposes of our legal analysis, we will disregard the distinctions between Lodestar and its affiliated licensees, *viz.*, Avalon, Protégé, and MHW. Under the Lanham Act, legitimate use of a trademark "by related companies . . . inure[s] to the benefit of the registrant." 15 U.S.C. § 1055.

therefore the "prior user" who "would have the priority of rights" and who "could seek to enjoin Lodestar's later use." Lodestar asserts, by contrast, that these activities are sufficient to constitute prior use in commerce and that it therefore has priority of rights even under a first-to-use standard. Lodestar also argues that, because the Untamed *Design* Mark on Avalon's The Wild Geese Irish Soldiers & Heroes whiskey includes the word "Untamed," the pre-August 2013 sale of more than 1,000 cases of that whiskey should count as use of the Untamed *Word* Mark.

We need not resolve these issues. Even assuming that Lodestar did not actually use the Untamed Word Mark in commerce before Bacardi launched its allegedly infringing campaign, we conclude that the amendments to the Lanham Act implementing the Madrid Protocol modify the priority of trademark rights that might otherwise flow from the parties' various uses of their respective marks. Under those amendments, Lodestar's post-November 2013 bona fide use of the Untamed Word Mark, coupled with the earlier "constructive use" date afforded to Lodestar under the Madrid Protocol, is sufficient to give it priority of rights.

## A

In addressing the effect of the Madrid Protocol on rights of priority in trademarks, we begin with the relevant language of Title XII of the Lanham Act, which Congress added to implement the Protocol. That title contains two key provisions describing the rights that flow from a grant of extension of protection in the U.S.

First, § 66(b) states that, unless extension of protection is refused, "the proper filing of the request for extension of protection" with the PTO "shall constitute constructive use of the mark, conferring the same rights as those specified"

for intent-to-use applications under § 7(c), as of the earlier of three possible dates. 15 U.S.C. § 1141f(b).[5] Section 7(c), in turn, states that, "*[c]ontingent on the registration of a mark on the principal register*" under the Lanham Act, "the filing of the application to register such mark shall constitute constructive use of the mark," thereby conferring the following "right of priority":

> a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person except for a person whose mark has not been abandoned and who, prior to such filing—
>
> > (1) has used the mark;
> >
> > (2) has filed an application to register the mark which is pending or has resulted in registration of the mark; or
> >
> > (3) has filed a foreign application to register the mark on the basis of

---

[5] The three dates are (1) the date of the underlying international registration, "if the request for extension of protection was filed in the international application"; (2) the date of the PTO's "recordal of the request for extension of protection, if the request for extension of protection was made after the international registration date"; or (3) a claimed "date of priority," not more than six months preceding the international-registration or PTO-recordal dates, that is "based on a right of priority within the meaning of Article 4 of the Paris Convention for the Protection of Industrial Property." 15 U.S.C. §§ 1141f(b)(1)–(3), 1141g. Lodestar apparently invoked the third option, because its application for extension of protection reflects a claimed priority date of July 16, 2009, which precedes the international-registration and PTO-recordal dates (both of which are August 19, 2009).

which he or she has acquired a right of priority, and timely files an application under section 1126(d) of this title [*i.e.*, § 44(d) of the Lanham Act] to register the mark which is pending or has resulted in registration of the mark.

15 U.S.C. § 1057(c) (emphasis added).

Second, § 69(b) states that, "[f]rom the date on which a certificate of extension of protection is issued" by the PTO, "(1) such extension of protection shall have the same effect and validity as a registration on the Principal Register"; and "(2) the holder of the international registration shall have the same rights and remedies as the owner of a registration on the Principal Register."  15 U.S.C. § 1141i(b).

Under these provisions, the PTO's issuance of an extension of protection to the Untamed Word Mark had "the same effect" as a "registration" on the Principal Register. *See id*. § 1141i(b)(1).  As a result, that issuance satisfied the contingency on which the rights specified in § 7(c) depend, *viz*., that there be a "registration of [the] mark on the principal register," *id*. § 1057(c).  With the fulfillment of that contingency, Lodestar thereby was granted the "right of priority" described in § 7(c) as of the date specified in § 66(b), which in this case is July 21, 2009. *See supra* note 5.  Moreover, because it is undisputed that Bacardi did not use, or apply to register, the allegedly infringing "Bacardi Untameable" mark before the filing of Lodestar's request for extension of protection on August 19, 2009, the plain language of § 7(c) grants Lodestar "a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against" Bacardi.  *Id*. § 1057(c).  Here, the relevant goods or services specified in

Lodestar's certificate of extension of protection are "rum, whiskey and distilled spirits." Therefore, as of July 21, 2009, Lodestar had a "right of priority" against Bacardi with respect to use of the Untamed Word Mark on or in connection with rum.

Moreover, because an extension of protection is treated as equivalent to a trademark registration, *see id*. § 1141i(b)(1), an extension of protection constitutes

> *prima facie evidence* of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

*Id*. § 1057(b) (emphasis added). Accordingly, the PTO's extension of protection to the Untamed Word Mark constitutes "prima facie evidence" that Lodestar owns the mark and has the "exclusive right" to use it "on or in connection with" rum or whiskey. *Id*.

As noted earlier, Title XII of the Lanham Act grants these registration-related rights without requiring the registrant to first establish actual use of the mark in the U.S. *See supra* at 10–11. That does not mean, however, that use in commerce is therefore irrelevant to the exercise or enforceability of these rights. In particular, nothing in the text of the Lanham Act suggests that its liberalization of the rules for obtaining *registration* of marks under the Madrid Protocol operates to override the settled foundational principle of trademark law that "only use in the marketplace

can establish a mark" and that registration alone "does not create a mark or confer ownership" in a trademark. *Miller*, 454 F.3d at 979. On the contrary, by providing that a recipient of an extension of protection under the Protocol has "the *same* rights and remedies as the owner of a registration on the Principal Register," 15 U.S.C. § 1141i(b)(2) (emphasis added), the Act confirms that, subject to the alterations in priority of rights set forth in Title XII, such a recipient must establish the same elements ordinarily required to obtain remedies for trademark infringement under § 32 or for unfair competition under § 43. Those include actual use in commerce. *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 873 (9th Cir. 2014) (noting that "use in commerce" is an "element of Lanham Act claims under sections 32 and 43(a)"). Indeed, Lodestar conceded in its reply brief that it "was required to use the mark before suing for infringement."

## B

Against this backdrop, the key question here is who has an enforceable priority of right in a trademark when (1) a registration was obtained under the Madrid Protocol without showing pre-registration use in commerce; and (2) the registrant's actual use in commerce did not begin until *after* the allegedly infringing use began. We have found no authority directly addressing this question, but there is precedent and commentary addressing a similar issue under the comparable provisions of § 44(d) of the Lanham Act, and we find it instructive.

Unlike the provisions of Title XII, which are specific to the Madrid Protocol, § 44 is a general provision that addresses registration of foreign marks under the provisions of any applicable "convention or treaty relating to trademarks." 15 U.S.C. § 1126(b). Like Title XII, however,

§ 44 "allows a foreign national to register a mark even though the mark has never been used in U.S. commerce." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 505–06 (9th Cir. 1991); *see also* 15 U.S.C. § 1126(e) (stating that an application under § 44 "must state the applicant's bona fide intention to use the mark in commerce, but use in commerce shall not be required prior to registration"). In accordance with a relevant treaty, a registration for an eligible mark may be granted to a foreign applicant under § 44 based on a showing that the mark is "duly registered in the country of origin of the foreign applicant" and that the applicant has a "bona fide intention to use the mark in commerce." 15 U.S.C. § 1126(e). Such an application "shall be accorded the same force and effect as would be accorded to the same application if filed in the United States on the same date on which the application was first filed in such foreign country," provided that, *inter alia*, the U.S. application must be "filed within six months from the date on which the application was first filed in the foreign country." *Id*. § 1126(d). A registration granted under § 44, however, has no effect on "rights acquired by third parties before the date of the filing of the first application in the foreign country." *Id*. § 1126(d)(3). As for remedies, § 44 makes clear that nothing in that subsection entitles "the owner of a registration granted under this section to sue for acts committed prior to the date on which his mark was registered *in this country* unless the registration is based on use in commerce." *Id*. § 1126(d)(4) (emphasis added).

In *SCM Corp. v. Langis Foods Ltd.*, 539 F.2d 196 (D.C. Cir. 1976), the D.C. Circuit addressed a dispute over the priority of trademark rights resulting from an application

under the then-applicable version of § 44.[6]    Langis, a
Canadian company, and SCM, a U.S. company, both
claimed rights in the trademark "Lemon Tree," as used in
fruit beverages. *Id*. at 197–98 & nn. 1 & 4. Langis filed a
trademark application in Canada on March 28, 1969, and it
began using the mark in Canada on May 15, 1969.
Coincidentally, SCM began using the "Lemon Tree" mark
in the U.S. on the latter date.    Both companies filed
applications in the U.S., with SCM filing first on June 18,
1969, and Langis filing an application under § 44 on
September 19, 1969. *Id*. at 198. In October 1971, Langis's
U.S. application was granted even though Langis had not yet
used the mark in the U.S. *Id*. SCM sought cancellation of
Langis's registration, claiming (as Bacardi does here) that it
had priority of rights based on its first use of the mark in the
U.S. *Id*. The TTAB rejected this argument, but after SCM
filed suit, the district court agreed with SCM. *Id*.

---

[6] The statute at the time was in all material respects similar to the
current version, except that § 44(e) did not contain the language, added
in 1988, providing that "[t]he application must state the applicant's bona
fide intention to use the mark in commerce, but use in commerce shall
not be required prior to registration." *See* Pub. L. No. 100-667, § 133,
102 Stat. 3935, 3946 (Nov. 16, 1988). Even in the absence of that
specific provision, however, the *SCM* court held that applicants under
§ 44 could obtain registration without showing use in commerce in the
U.S.    The court noted, in particular, that the then-existing version of
§ 44(d)(2) of the Lanham Act specifically exempted § 44 applications
from § 1(a)'s requirement that applications must identify the first date on
which the mark was used in commerce. 539 F.2d at 199–200; *see also*
15 U.S.C. § 1126(d)(2) (1970) (stating that, in applications under § 44,
"use in commerce need not be alleged"). That exemption, together with
the other statutory features noted above, led the court to conclude that
the "clear implication is that section 44 recognizes registration based on
something other than 'use in commerce,' namely, a foreign registration."
*Id*. at 200 (citation omitted). The 1988 amendment confirmed that same
conclusion more explicitly.

The D.C. Circuit reversed.  The court agreed with Langis that, by providing that a § 44 application "shall be accorded the same force and effect as would be accorded to the same application if filed in the United States on the same date on which the application was first filed in the foreign country," § 44(d) "grants a foreign applicant which has used the trademark in its home country *after* the foreign filing but *prior* to the actual United States filing a *constructive use date* as of the date of the foreign filing."  539 F.2d at 199.  As a result, Langis had "priority since its constructive use date of March 28, 1969"—*i.e.*, the date of its Canadian application—"preceded SCM's actual use date of May 15, 1969."  *Id*.  The court also examined the particular treaty on which Langis relied and concluded that it reinforced this reading of § 44.  *Id*. at 200–01.  Accordingly, the court held that Langis's mark "must be protected in this country from the date of the foreign application even as against an intervening first use by another in the United States."  *Id*. at 201.

Although *SCM* involved a registration dispute and not an infringement claim, its reasoning necessarily leads to the conclusion that, once a § 44 registrant begins use of the mark in the U.S. (and can therefore invoke the remedy of an infringement action), that registrant's earlier *constructive* use date gives it a priority of right over a then-competing user who first actually used the mark in commerce after that constructive use date.  Indeed, the *SCM* court favorably cited the decision in *American Petrofina, Inc. v. Brown*, 391 F. Supp. 757 (E.D.N.C. 1974), which addressed precisely such an infringement suit.  *See* 539 F.2d at 198 n.8.  In *Brown*, the plaintiffs' foreign parent corporations registered the "Fina" trademark in Canada prior to 1954, and in January 1956 they obtained registration in the U.S. under § 44(d) "without prior use in commerce within the United

States." 391 F. Supp. at 758. In August 1956, defendant Brown began using the Fina mark in the U.S., and plaintiffs subsequently began using the mark in the U.S. in October 1956. *Id*. Explicitly rejecting the district court decision that was reversed by the D.C. Circuit in *SCM*, the *Brown* court held that, under § 44, the plaintiffs were "entitled to protection against the use of this mark by defendants notwithstanding defendants may have started using the registered mark after the registration had issued but before plaintiffs had used the mark in United States commerce." *Id*.

We find the reasoning of *SCM* and *Brown* to be persuasive in the analogous context of the Madrid Protocol. If anything, the reasoning of those cases fits the language of Title XII of the Lanham Act even better than it did the pre-1988 version of § 44 construed in those cases. Whereas the version of § 44 construed in *SCM* did not explicitly include a reference to "constructive use," *see supra* at 32 n.6, Title XII expressly cross-references the "constructive use" concept that Congress added to § 7(c) in 1988 when it authorized intent-to-use applications. 15 U.S.C. § 1057(c); *see also Zobmondo Ent.*, 602 F.3d at 1111 n.3 (noting that § 7(c) gives an intent-to-use applicant "priority-of-use over anyone who adopts the mark after the *constructive*-use date") (emphasis added); *Aktieselskabet*, 525 F.3d at 18 (holding that, in a cancellation proceeding, "an intent-to-use applicant prevails over any opposer who began using a similar mark after the intent-to-use filing date").

We therefore conclude that, under the Madrid Protocol, as under § 44 in *SCM*, a foreign applicant who obtains a registration without showing actual use in the U.S. has a right of priority, as of the relevant "constructive use" date, over another company who first uses the mark in the U.S. *See SCM*, 539 F.2d at 199–200. And once that registrant

begins actually using the mark in the U.S.—and does so even *after* the competing user has begun using the mark—the registrant may bring an infringement action (subject to any applicable defense) based on that superior right of priority. *See Brown*, 391 F. Supp. at 758.

We find further support for this conclusion in Professor McCarthy's persuasive analogy between the type of situation presented under § 44 in *Brown* and the so-called "*Dawn Donut* rule." *See* 5 MCCARTHY ON TRADEMARKS § 29:21 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959)).  Under that rule, where a federal registrant and an alleged infringer are both "using the respective marks in geographically separate and distinct market areas, with no real competition between them, and where there is no present likelihood that the federal registrant will expand his use into the area of use of the intrastate user, there is no cause shown for injunctive relief based on infringement." *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir. 1969).  But if that federal registrant *expands* its business "to the point that the use of the conflictingly similar marks by the registrant and the unauthorized user are no longer confined to separate and distinct market areas and there is established the likelihood of public confusion, the federal registrant is entitled under the authority of the Lanham Act to injunctive relief." *Id*. (citing *Dawn Donut*, 267 F.2d at 365).  According to Prof. McCarthy, that situation is analogous to a foreign registrant who is using a mark abroad and who is then granted a registration under § 44 without showing actual use in the U.S. *See* 5 MCCARTHY ON TRADEMARKS § 29:21.  As with the *Dawn Donut* rule, a § 44 registrant who is using a mark elsewhere has a *priority* that extends into additional geographic areas in which it may not yet be actually using the mark, and when it later begins using the

mark in those additional areas, it may then sue for infringement.  This same analogy is equally applicable to Title XII of the Lanham Act.  It further supports the conclusion that, once a registrant under the Madrid Protocol actually begins using the registered mark within the U.S., it is then entitled to assert an infringement claim, based on its statutory priority of right, against those who may have used the mark after the registrant's constructive use date but before the registrant's actual use in the U.S.

## C

Viewing the evidence in the light most favorable to Lodestar, we agree that, at the very least, Lodestar used the Untamed Word Mark in commerce when, beginning in 2014, it began selling in the U.S. its previously developed The Wild Geese Soldiers & Heroes rums (which used the mark on the back of the bottles).  *See also infra* at 47.[7]  Even assuming that these 2014 sales of The Wild Geese Soldiers & Heroes rums were Lodestar's *first* actual uses of the Untamed Word Mark in the U.S.—and therefore occurred *after* Bacardi began using "Bacardi Untameable" in November 2013—we hold that Lodestar thereby acquired a potentially enforceable priority of right against Bacardi under Title XII.  That is, having begun actual use in the U.S., Lodestar could then assert a claim for infringement or unfair competition under the Lanham Act against Bacardi, so long as (1) it demonstrates the requisite likelihood of confusion; and (2) Bacardi fails to establish any applicable defense.

---

[7] Bacardi does not appear to contest this specific point on appeal. As we discuss in the next section, Bacardi instead argues that Lodestar's post-November 2013 development of an entirely new "Untamed Revolutionary Rum" product should be disregarded in assessing trademark infringement in this case.

Here, the only affirmative defense that Bacardi asserted below on summary judgment was that Lodestar had abandoned the Untamed Word Mark.  The district court, however, held that there was a disputed issue of material fact as to abandonment, and neither party has challenged that holding on appeal.  We therefore assume for purposes of this appeal that Lodestar did not abandon the mark.  Consequently, the only remaining question is whether Lodestar presented sufficient evidence of a likelihood of confusion to survive summary judgment.  We turn to that issue in the next section.

## IV

Lodestar's burden to show a likelihood of confusion is "exactly the same" for its "unfair competition" claim under § 43 "as for [its] trademark infringement" claim under § 32.  *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  The type of confusion more commonly alleged in trademark cases is "forward confusion," in which "a look-alike, sound-alike, feel-alike unknown" tries "to cash in on [a] famous mark's goodwill," *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1128, 1130 n.5 (9th Cir. 1998), leading "consumers [to] believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," *Surfvivor*, 406 F.3d at 630.  That is not Lodestar's claim here: it has not contended or shown that Bacardi is trying to pass off its goods as those of Lodestar.  Instead, Lodestar's claim is one of so-called "reverse confusion," in which "a person who knows only of [a] well-known junior user comes into contact with [a] lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021).  The

concern with reverse confusion is not a "question of palming off, since neither junior nor senior user wishes to siphon off the other's goodwill," *Dreamwerks*, 142 F.3d at 1130, but rather that the "small senior user [will lose] control over its identity in 'the rising tide of publicity associated with the junior mark.'" *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 (9th Cir. 2000) (citation omitted); *see also Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) ("[T]he smaller senior user" in a reverse confusion case "seeks to protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity.").

In assessing the likelihood of confusion here, we therefore ask "whether consumers doing business with [Lodestar] might mistakenly believe that they are dealing with [Bacardi]." *Dreamwerks*, 142 F.3d at 1130. "When assessing reverse confusion on summary judgment, we ask whether . . . a reasonable jury could conclude that consumers would believe [Bacardi] is the source of, or a sponsor of," Lodestar's products. *Ironhawk Techs.*, 2 F.4th at 1160; *Dreamwerks*, 142 F.3d at 1129 (the "test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks"). To make this determination, we evaluate the eight so-called "*Sleekcraft* factors":

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product
lines.

*Ironhawk Techs.*, 2 F.4th at 1160 (quoting *M2 Software, Inc.
v. Madacy Ent.*, 421 F.3d 1073, 1080 (9th Cir. 2005)).
"These factors are neither exhaustive nor dispositive; it is the
totality of facts in a given case that is dispositive."  *Id.*
(citations and internal quotation marks omitted).

We agree with the district court's conclusion that Lodestar
failed to carry its burden to show a likelihood of confusion
under the *Sleekcraft* factors, although our reasoning differs
in some respects from the district court's.

## A

In applying the *Sleekcraft* factors, we confront a
threshold question as to which of Lodestar's products should
be considered in that analysis.  The district court applied a
bright-line rule that "the relevant products for purposes of
determining likelihood of confusion are Lodestar's products
as they existed *prior* to the 'Bacardi Untameable Since 1862'
campaign" (emphasis added).  The district court cited no
authority adopting such a hard-and-fast temporal rule,
relying instead on its view that "the goals of trademark law
would not be served by using a product that was developed
*after* a competitor's alleged infringement for purposes of
determining a likelihood of confusion."  Because Lodestar's
"Untamed Revolutionary Rum" product was indisputably
developed after Bacardi's "Untameable" campaign began
and was motivated at least in part by Lodestar's desire to
combat Bacardi's perceived infringement, the district court
excluded it entirely from the likelihood-of-confusion
analysis.  Instead, the district court considered only
Lodestar's The Wild Geese Soldiers & Heroes rum products,
which had already been developed and marketed by the time

the Bacardi campaign began, even though they too were not sold to U.S. consumers until later. Although we ultimately agree that the Untamed Revolutionary Rum product should be excluded from the likelihood-of-confusion analysis, we reach that conclusion by a different route.

**1**

For several reasons, the district court committed legal error by adopting a categorical *temporal* rule excluding any consideration of a senior user's post-infringement use of the mark on additional products.

First, the district court's bright-line rule is hard to square with the Madrid Protocol regime and the comparable intent-to-use framework on which that regime is partly modeled. As we have explained, Title XII of the Lanham Act grants registration, and rights of priority, to foreign registrants based on a bona fide intent to use the mark in the U.S., without the need to first show actual use in the U.S. *See supra* at 10–11. Although subsequent actual use of the mark is required before an infringement claim can be asserted, Title XII grants a right of priority to a Madrid Protocol foreign registrant even if that registrant does not actually begin using the mark in commerce until *after* an alleged infringer has already first begun to do so. A central purpose of the intent-to-use and Madrid Protocol frameworks is to ensure that a company planning to use a mark does not lose that right to a potential infringer who jumps ahead and actually uses the mark first. *See supra* at 9. It would be fundamentally inconsistent with that purpose to limit the registrant to *only* those *particular* uses that it contemplated at the time of its application. The district court's categorical rule would potentially incentivize so-called "pirates" to make the first use of marks that they see in published intent-to-use or Madrid Protocol applications, because doing so

would allow them to box in the applicant by limiting the latter's ability to reevaluate how it will actually use the mark in the marketplace.

Nothing in the text of Title XII, or any other provision of the Lanham Act, supports the district court's *per se* rule. Section 66(a) requires that, in order for an extension-of-protection application to be properly filed with the PTO, it must have "attached to it a declaration of bona fide intention to use the mark in commerce that is verified by the applicant for, or holder of, the international registration." 15 U.S.C. § 1141f(a).[8] But the Act nowhere states that, if such an application is subsequently granted, the registrant is then limited to only those particular bona fide uses that it contemplated at the time of the making or granting of the application or in its subsequent initial use in the U.S. Instead, the Act states only that, after publication of the mark and resolution of any resulting objections, the PTO "shall issue a certificate of extension of protection," which then confers the "same rights and remedies as the owner of a registration on the Principal Register." *Id*. § 1141i(a), (b)(2).

Second, the district court's *per se* rule is difficult to reconcile with the long-understood notion—expressly incorporated into one of the eight *Sleekcraft* factors—that trademark owners can expand their use of a mark, even in the face of then-existing competing infringing uses. Specifically, the eighth *Sleekcraft* factor addresses whether there is a "[l]ikelihood of expansion" of competition between the parties. *Sleekcraft*, 599 F.2d at 354. Because "a trademark owner is afforded greater protection against

---

[8] Bacardi has not contended on appeal that Lodestar did not satisfy this requirement in connection with its application for extension of protection.

competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Id*. (citation omitted.) And "[w]hen goods are closely related, *any* expansion is likely to result in direct competition." *Id*. (emphasis added). This factor thus takes into account both the possibility that the actions of the junior user may "hinder[]" the senior user's "expansion plans," *Surfvivor*, 406 F.3d at 634, and that trademark holders may properly choose to expand "both geographically and in the products and services that they offer," *Cohn*, 281 F.3d at 843; *see also Brookfield*, 174 F.3d at 1047 (noting that a senior user "has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion"). It reflects the understanding that the senior user "possesses superior rights in the mark," regardless of "whether or not [it] has actually expanded its use of its mark, after the commencement of the subsequent user's use, to goods or services which are the same as or closely related to those of the subsequent user." *Mason Eng'g & Design Corp. v. Mateson Chem. Corp.*, 225 U.S.P.Q. 956, 1985 WL 72027, at *6 (T.T.A.B. 1985).

Our express acknowledgement that trademark holders may change and expand their uses of their marks—and that they need not be hindered by an infringer's actions in doing so—further underscores that the district court erred in holding that a use of a mark that "was developed *after* a competitor's alleged infringement" should be categorically excluded from the likelihood-of-confusion analysis. *See also Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1312 (11th Cir. 1999) (noting that the "very existence of the 'related goods' or 'natural expansion' doctrine contemplates that . . . the senior user may reasonably expand into related goods").

## 2

The fact that new, post-infringement uses are not categorically excluded from the likelihood-of-confusion analysis does *not* mean, however, that such post-infringement uses necessarily stand on the same footing as the senior user's pre-infringement uses. For one thing, the particular circumstances surrounding each of the senior user's uses of a mark may affect how the various *Sleekcraft* factors apply in any given case. But more fundamentally, the Lanham Act generally limits enforceable trademark rights to *bona fide* uses that reflect genuine commercial endeavors rather than merely efforts to retain rights in a mark. *See* 15 U.S.C. § 1127. Seizing on that point, Bacardi contends that the Untamed Revolutionary Rum product does not reflect a bona fide use of the mark and should be excluded from the likelihood-of-confusion analysis on that alternative basis. We agree.

Section 45 of the Lanham Act defines "use in commerce" to "mean[] the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. That definition expressly describes the uses that are ordinarily needed to register a mark, *see id*. § 1051(a)(3)(C), and it analogously delimits the relevant uses that may give rise to enforceable trademark rights in the context of a regime, such as Title XII, in which registration may be granted in advance of any such use. The definition was amended by Congress in 1988 to overrule then-existing caselaw holding that "'token use' was sufficient to satisfy the use requirement and qualify a mark for registration." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) (citation omitted); *see also Chance*, 242 F.3d at 1157 (pre-1988 caselaw held that token use was sufficient "so long as it amounted to more than

a mere sham attempt to conform with statutory requirements") (citation omitted).

The text of the definition expressly distinguishes between use that is "merely to reserve a right in a mark" and a "bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. Several conclusions follow from this statutory language. First, by specifying that the use must be "in the ordinary course of trade," the statute requires "commercial use of the type common to the particular industry in question." *Chance*, 242 F.3d at 1156–57 (citation omitted). Second, the requirement that the use be "bona fide" means that it is done "for *genuine* commercial reasons" and not "*merely* to reserve its rights for a lawsuit." *Social Techs.*, 4 F.4th at 820–21 (emphasis added); *see also id.* at 817 n.8 ("bona fide" means "genuine, sincere and carried out in good faith"). The use of the word "merely" confirms that an otherwise genuine commercial use is "bona fide" even though *one* of the purposes of the use is to "reserve a right in a mark." Every trademark holder presumably intends that its commercial use will operate to protect its rights in its marks, and the mere existence of such a purpose, without more, is not itself sufficient to show that the use of the mark is not "bona fide." Third, and conversely, a purely *ancillary* commercial aspect to the use of the mark does not establish a "bona fide" use. Thus, for example, "token" or other insubstantial uses of a mark that are merely undertaken to reserve rights in a mark will not be "bona fide" even if they generate some non-zero amount of sales revenue. Instead, as noted, the use must involve activity of a scope and character that reflects "the ordinary course of trade." 15 U.S.C. § 1127.

Here, there can be no dispute that at least one of the purposes for Lodestar's sales of both The Wild Geese

Soldiers & Heroes rums and Untamed Revolutionary Rum was to reserve Lodestar's rights in the Untamed Word Mark. Although Lodestar had made substantial efforts towards developing and marketing The Wild Geese Soldiers & Heroes rums well before Bacardi began its "Untameable" campaign in November 2013, it had "decided to park th[at] USA rum project" in June 2013 and did not reactivate those efforts until after the Bacardi campaign started. *See supra* at 17,, 20–21. Moreover, Lodestar admits that the Untamed Revolutionary Rum product did not even exist in November 2013, and Levy acknowledged in a private email that the product was developed in part "to combat Bacardi's attempts to take over our Untamed mark." *See supra* at 19. The question, then, is whether the record contains sufficient evidence to allow a reasonable jury to find that Lodestar's post-November 2013 sales activities extend beyond merely reserving rights in the mark and instead reflect ordinary commercial use that is "common to the particular industry in question." *Chance*, 242 F.3d at 1157 (citation omitted).

In addressing this question, we note that § 45's definition of "use in commerce" contains further language explaining when a mark "shall be deemed to be in use in commerce" in the context of the *sale* of goods and the rendering of services. 15 U.S.C. § 1127. With respect to sales of goods, the relevant language of § 45 states that a mark will be deemed to be used in commerce on goods when (1) "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto"; and (2) "the goods are sold or transported in commerce." *Id.*[9] Consistent with this language, we have stated that a

---

[9] Section 45's definition of "use in commerce," states, in full:

"single sale . . . *may* suffice" to establish use in commerce. *See Social Techs.*, 4 F.4th at 821 n.11 (emphasis added). But to qualify as establishing "use in commerce," and not merely a token use to reserve rights in a mark, any such modest initial sales must have been made in a "bona fide" transaction, and they must be "accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade." *Chance*, 242 F.3d at 1157; *see also* 3 MCCARTHY ON TRADEMARKS § 19:109

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

(stating that the question in such cases is whether modest initial sales are "followed up within a reasonable time by a continually increasing level of sales appropriate for this business").

Applying this standard, we first conclude that a reasonable jury could find that Lodestar's use of the Untamed Word Mark on the back of The Wild Geese Soldiers & Heroes Premium Rum and Golden Rum bottles constituted bona fide "use in commerce." Regardless of whether Lodestar's various pre-sales activities *themselves* amounted to "use in commerce,"[10] Lodestar's substantial preparatory activities in developing and marketing The Wild Geese Soldiers & Heroes rums support a reasonable conclusion that Lodestar's subsequent sales of those rum products beginning in late 2014 was undertaken at least in part for "genuine commercial reasons" and not "merely to reserve a right" in the Untamed Word Mark. *See Social Techs.*, 4 F.4th at 821.

To be sure, Lodestar had paused its efforts to market this product in the U.S. shortly before Bacardi's campaign began, and Lodestar then resumed those activities at least in part in response to that campaign. Further, Lodestar's expert's report indicates that, after an initial sale of 192 cases (1152 bottles) to a single mid-west distributor in late 2014,

---

[10] We have stated that certain promotional activities undertaken even "prior to [the] first sale" may be sufficient, under the totality of the circumstances, to establish use in commerce. *See Chance*, 242 F.3d at 1158–59. But as explained earlier, given that Lodestar's claimed priority of right need not rest on actual use, we need not decide whether Lodestar's pre-sales activities that occurred before Bacardi's campaign *themselves* rose to the level of "use in commerce." But those activities nonetheless inform the understanding of the subsequent actual sales activities that Lodestar undertook. *See Social Techs.*, 4 F.4th at 820–21.

Lodestar did not sell any additional bottles over the five years from 2014–2018. Over that time period, Lodestar's only other distribution consisted of the delivery of 16 sample bottles. Although the question is close, a reasonable jury viewing the totality of these circumstances could conclude that, even if the immediate cause of Lodestar's resumption of its substantial efforts to develop and market The Wild Geese Soldiers & Heroes was the November 2013 Bacardi campaign, those efforts, despite their limited success, still reflected a bona fide use of the Untamed Word Mark in commerce.

The circumstances are different with respect to the Untamed Revolutionary Rum product. In contrast to The Wild Geese Soldiers & Heroes rum, the record contains no evidence that the Untamed Revolutionary Rum had even been conceived before the Bacardi campaign, much less that any substantial steps had been taken towards marketing it. The bottling and labeling were put together very quickly within weeks of the start of the Bacardi campaign, and one distributor reported to Lodestar that it would not carry the product because the "current label isn't good" and it will "require a label change." An internal report also stated that the rum used for the Untamed Revolutionary Rum was the same as for The Wild Geese Soldiers & Heroes Golden Rum. Lodestar's expert's report revealed that only 96 cases (576 bottles) were sold to a single mid-west distributor in late 2014. No other sales were reflected for the entire five-year period from 2014–2018; instead, the only additional distribution reflected in that report consists of a total of 19 sample bottles delivered over that time period. Moreover, Levy stated in an internal email that the Untamed Revolutionary Rum product had been conceived "to complement the Wild Geese Rum and also to combat Bacardi's attempts to take over our Untamed mark."

Viewing the totality of these circumstances, the inference is inescapable that Untamed Revolutionary Rum was not a serious effort to develop a product "for genuine commercial reasons," but rather merely an attempt merely to reserve Lodestar's rights in the mark and "provide a basis" for an eventual suit against Bacardi. *Social Techs.*, 4 F.4th at 821.

This conclusion is confirmed by our recent decision in *Social Technologies*. There, we held that the plaintiff's trademark registration for the "MEMOJI" mark for "mobile phone application software," which had been based on an intent-to-use application, was not supported by a bona fide "use in commerce" within the meaning of § 45. *See* 4 F.4th at 814, 819–22. In the two years after filing its intent-to-use application, the plaintiff "developed no code for its Memoji application and had no sales," and its limited preparatory activities were "not sufficiently public to establish trademark rights." *Id.* at 819. After Apple released a "Memoji application" in June 2018, the plaintiff "rushed to develop the code for and release its Memoji application." *Id.* at 820. Internal documents reflected that its purpose in doing so was "merely to reserve its rights for a lawsuit against Apple." *Id.* Although the plaintiff was able to point to "5,000 downloads of its Memoji application," we concluded that these limited transactions amounted to "token use" that was ancillary to the "purpose of reserving [the plaintiff's] rights to the MEMOJI mark and winning a lawsuit against Apple." *Id.* at 821. Against this backdrop, these downloads did not support an inference that the plaintiff had "developed its Memoji application for genuine commercial reasons warranting trademark protection." *Id.*

In this case, Lodestar had taken no steps to produce an "Untamed Revolutionary Rum" product, and when Bacaradi began its "Untameable" campaign, Lodestar rushed to

develop such a product for the express purpose of combating the Bacardi campaign. Although it made a modest set of sales in late 2014 to a single distributor, Lodestar thereafter made no further sales for the next four years. Coupled with the lack of any preparatory activities or any serious product development efforts, these limited sales do not reflect a "continuing effort or intent to continue such use and place the product on the market on a commercial scale" within a reasonable period of time. *Chance*, 242 F.3d at 1157. On the contrary, as with the limited downloads in *Social Technologies*, the one-time set of sales to a single distributor in five years constitutes a token use that is merely ancillary to the effort to reserve rights in the mark and does not establish sales activity reflecting "genuine commercial purposes." *Social Techs.*, 4 F.4th at 821.

Accordingly, although we disagree with the district court's broader reasoning, we conclude that, under the specific circumstances of this case, the development of the Untamed Revolutionary Rum product did not reflect a bona fide use in commerce and was properly excluded from the likelihood-of-confusion analysis.

## B

Lodestar also contends that, even if the district court properly limited its analysis to The Wild Geese Soldiers & Heroes rums, it nonetheless improperly assessed three of the eight *Sleekcraft* factors: (1) strength of the mark; (2) similarity of sight, sound, and meaning; and (3) the defendant's intent. We conclude that the district court erred in certain respects in its consideration of two of these factors, but those errors do not alter the ultimate conclusion that no reasonable jury could find a likelihood of confusion here.

## 1

"The purpose of examining the strength of the plaintiff's mark is to determine the scope of trademark protection to which the mark is entitled.  The more unique the mark, the greater the degree of protection." *Surfvivor*, 406 F.3d at 631 (citation and footnote omitted).  In reverse confusion cases, we compare "the conceptual strength of [the plaintiff's] mark[] . . . to the commercial strength of [the defendant's] mark." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016).  Here, Lodestar does not dispute the district court's conclusion that the Bacardi Untameable campaign was "commercially robust," but it challenges the court's holding that Lodestar's Untamed Word Mark was conceptually weak.

"To determine a mark's conceptual strength, we classify a mark along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." *JL Beverage*, 828 F.3d at 1107. We have described the categories as follows:

> Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and "trigger the highest degree of trademark protection."  In the middle of the spectrum are suggestive marks, which suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product.  Descriptive and generic marks, at the other end of the spectrum, are the two weakest categories.  Descriptive marks define a particular characteristic of the product in a way that does not require any

> imagination, while generic marks describe
> the product in its entirety and are not entitled
> to trademark protection.

*Id.* (citations omitted).  Here, the district court concluded that the Untamed Word Mark was "more suggestive than arbitrary," a finding it based primarily on evidence that third parties have often used "the word 'untamed' in connection with alcohol."  We agree with the district court's conclusion that no reasonable jury could find that the Untamed Word Mark is arbitrary.

"An arbitrary mark . . . uses common words in a fictitious and arbitrary manner to create a distinctive mark which identifies the source of the product." *Dreamwerks*, 142 F.3d at 1130 n.7.  Because such a mark "neither describes nor suggests anything about the nature" of the goods, 2 MCCARTHY ON TRADEMARKS § 11:11, "the trademark holder must work hard to make consumers associate the trademark with the product," *Dreamwerks*, 142 F.3d at 1130 n.7.  As a result, an arbitrary mark "deserve[s] wide protection because the trademark holder can properly expect to run into very little confusion from honest competitors." *Id.*; *see also Stork Rest. v. Sahati*, 166 F.2d 348, 355 (9th Cir. 1948) (holding that "The Stork Club" was an arbitrary trade name because a stork was "in no way descriptive of the appellant's night club").  The expert opinion evidence presented by Lodestar does not support a finding that "Untamed" is an arbitrary mark under these standards.

Lodestar's expert rested his conclusion that the mark was "arbitrary" on the fact that the term "Untamed" "clearly do[es] not describe the product—namely rum" and, in ordinary usage, is more commonly associated with the

category of "nature," including animals and lands. We agree that the Untamed Word Mark is not "descriptive," but Lodestar's expert provided no adequate, non-conclusory basis for concluding that the mark was arbitrary rather than *suggestive*. By contrast, Bacardi submitted evidence of what the district court described as "27 labels approved by the Alcohol and Tobacco Tax and Trade Bureau between December 2005 and January 2018 which feature the word 'Untamed,'" as well as several pieces of promotional material in which the word "untamed" is used to describe alcohol. As the district court noted, the fact that numerous other alcoholic beverage sellers, on dozens of other occasions, chose to use a particular word in their marketing materials weighs heavily against the notion that the connection between that term and such products is "arbitrary." *See M2 Software*, 421 F.3d at 1088 ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue.").[11] Consumers must exercise some imagination (but not much) to associate the term "Untamed" with the image of a hard liquor—reflecting, perhaps, how its consumption might make one feel. We therefore agree with the district court that the Untamed Word

---

[11] We reject Lodestar's arguments that the district court should not have considered this evidence of third-party use. Evidence of third-party use of a similar mark is relevant to the strength of the mark, *see M2 Software*, 421 F.3d at 1088, and the district court did not abuse its discretion in concluding that the documents contain sufficient "circumstantial indicia of authenticity" under Federal Rule of Evidence 901. And whether Bacardi presented sufficient evidence to show that these third-party uses were associated with actual U.S. sales is irrelevant to the admissibility of these documents for the more limited purpose of showing that the word "untamed" has been repeatedly associated with alcohol products.

Mark is more suggestive than arbitrary.  *See Surfvivor*, 406 F.3d at 632.

The district court erred, however, in then concluding that the strength-of-the-mark factor "weighs against confusion because Lodestar's UNTAMED word mark is conceptually weak."  We have recognized that suggestive marks are "inherently distinctive" and are entitled to "greater protection," *see Ironhawk Techs.*, 2 F.4th at 1162 (citation omitted), even though we have sometimes also described them as "presumptively weak," *Brookfield*, 174 F.3d at 1058.  Given that the Untamed mark is properly considered distinctive for purposes of summary judgment, the strength-of-the-mark factor in this reverse confusion case focuses on "whether the junior mark is so commercially strong as to overtake the senior mark." *Ironhawk Techs.*, 2 F.4th at 1162 (simplified).  Given the overwhelming commercial strength of Bacardi's "Untameable" mark, this factor weighs in favor of a likelihood of confusion.  *See Surfvivor*, 406 F.3d at 632.

## 2

"Similarity of the marks is tested on three levels: sight, sound, and meaning," and "[e]ach must be considered as they are encountered in the marketplace." *Sleekcraft*, 599 F.2d at 351; *see also M2 Software*, 421 F.3d at 1082 (stating that, in assessing this factor, the mark must be viewed "as a whole, as it appears in the marketplace") (citation omitted).  As the district court recognized, Lodestar's expert failed properly to address how consumers would encounter the Untamed Word Mark in the marketplace, because the expert *only* considered the "Untamed Revolutionary Rum," in which the mark appeared prominently in the name of the product.  As to The Wild Geese Soldiers & Heroes rums, however, the "Untamed" mark appeared only on the back label, below a considerable

amount of writing. *See supra* at 15–16. We have recognized that, when (as here), two parties use the same or similar marks "merely as a tagline to their distinctive business names," the subordinate position of that tagline mark to their "housemarks" weighs against a likelihood of confusion. *Cohn*, 281 F.3d at 842. On this record, the district court properly concluded that "the manner in which consumers actually encountered [the] marks weighs against any likelihood of confusion."

### 3

In a reverse confusion case such as this one, the "defendant's intent in selecting the mark" may weigh in favor of confusion in a variety of different ways, depending upon the nature of the potential for confusion shown by the circumstances. *Marketquest Grp. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). A relevant intent may be shown "by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Id*. at 934–35; *see also Surfvivor*, 406 F.3d at 634 ("'[W]here the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark,' resolution of this factor favors [the plaintiff].") (citation omitted).

Because it is undisputed that Bacardi knew about the Untamed Word Mark prior to its campaign, the district court erred in concluding that the intent factor did not weigh, on balance, in Lodestar's favor. We recognize that, from the time that Bacardi learned of Lodestar's mark to the time that Bacardi began its campaign, Lodestar had made little use (if any) of the Untamed Word Mark in U.S. commerce. *See supra* at 15–17. While that is a mitigating consideration to

be considered in the overall balance of the *Sleekcraft* factors, the district court erred in concluding that this factor did not weigh in favor of a likelihood of confusion. *Ironhawk Techs.*, 2 F.4th at 1167–68; *Marketquest*, 862 F.3d at 934–35; *Surfvivor*, 406 F.3d at 634.

**4**

Lodestar does not challenge on appeal the district court's assessment of the other five *Sleekcraft* factors, which we briefly summarize:

- Given that Lodestar and Bacardi both used their respective marks in the marketing of rum, the factor addressing proximity of the goods weighed in favor of a likelihood of confusion.

- Because Lodestar's The Wild Geese Soldiers & Heroes rums were a previously developed product line that would compete with Bacardi's rum, there is no issue here concerning a likelihood of expansion of product lines.

- As to the evidence-of-confusion factor, the district court concluded that, because Lodestar was unable to identify "any U.S. consumers who were confused as to the source of its products"—despite Bacardi's approximately three-and-a-half-year advertising campaign—this factor weighed "slightly against any likelihood of confusion."

- Given that (1) Bacardi used the "Bacardi Untameable" mark only in advertisements that were displayed in a variety of media that Lodestar did not use; and (2) Lodestar used the "Untamed" mark predominantly on the back label of its The Wild

Geese Soldiers & Heroes rums, the district court held that the marketing-channels factor also weighed "slightly against a likelihood of confusion."

- In view of the parties' failure to present a "consumer survey tailored to the products at issue in this case" or other relevant evidence, the district court held that the factor addressing the care with which consumers make purchases of the relevant product was neutral.

Considering all of the *Sleekcraft* factors together, we conclude that, despite the district court's specific errors with respect to two of those factors, the record nonetheless confirms that no reasonable trier of fact could "find that confusion is 'probable,' not merely 'possible.'" *M2 Software*, 421 F.3d at 1085 (citation omitted). Although the commercial strength of Bacardi's campaign weighs in favor of a likelihood of confusion with respect to Lodestar's competing rum, which bore a similar suggestive mark of which Bacardi was culpably aware, these factors are overwhelmingly offset by the fact that consumers would "encounter the trademarks differently in the marketplace," the companies' "marketing efforts [were] concentrated in different media," and Lodestar "presented no evidence of actual confusion" among consumers of its products. *Cohn*, 281 F.3d at 842.

Accordingly, Lodestar's claims under § 32 and § 43 of the Lanham Act fail as a matter of law. Because Lodestar has not contended that the non-monetary portion of its UCL claim could survive in the absence of a likelihood of confusion, that claim was properly dismissed as well. We

affirm the district court's grant of summary judgment to Bacardi.**[12]**

**AFFIRMED.**

---

**[12]** In view of our disposition, we need not reach the district court's alternative conclusion that Lodestar failed to substantiate its various claims for damages.